**CITY OF PAMPA v. TODD et ux.** (No. 3094.)

Court of Civil Appeals of Texas. Amarillo. Oct. 31, 1928.

Rehearing Denied Dec. 5, 1928.

Cook, Smith & McLynn, of Pampa, for appellant.

W. M. Lewright, of Pampa, and Ben S. Baldwin, of Fort Worth, for appellees.

RANDOLPH, J. This suit was filed by Todd and wife, plaintiffs, against the city of Pampa, defendant, to recover damages for the death of their daughter, Miss Mickey Todd. The trial was had before a jury, and, on the verdict of the jury, the court rendered judgment for the plaintiffs. From this judgment, the defendant has appealed.

The plaintiffs' suit is based on alleged negligence of the city in permitting a culvert to be taken up for the purpose of cleaning out a ditch over which the culvert had been placed, and, while said culvert was off of said ditch, in failing to keep warning lights and danger signals to warn persons passing over the street of the danger therefrom.

The defendant filed its answer consisting of general and special exceptions, general denial, and specially pleading certain defenses.

Plaintiffs excepted to that portion of defendant's answer alleging as follows:

"Defendant further alleges that the said L. G. Lunsford, the driver of said car, was negligent in failing to have said car under complete control immediately before reaching said ditch, and in failing to see the place where said culvert had been for a reasonable distance before reaching the same, and in being in said car with three other persons under the conditions hereinabove alleged, which made it impossible and impracticable for him to properly and adequately manage, control and operate the same, which negligence on the part of the said Lunsford defendant alleges was the sole proximate cause of the accident."

These allegations were excepted to on the grounds that same were irrelevant and immaterial to any issue in this cause, the same being an attempt upon the part of the pleader to impute the alleged negligence of the driver of the automobile to an invited guest in said car. This exception was sustained by the court.

The facts in evidence show that four parties were riding in a Ford coupé, three in the seat of the car and the other, the deceased, sitting partly on the lap of her sister and partly on the lap of the witness, Parker; that the coupé was crowded is evidenced by the deceased's sitting in the laps of the other two. The record contains expert testimony showing the size and seating capacity of the car, and shows that in front of the seat there was a large steering wheel, and the handle or gear shift of the lever that is attached to a Ruckstell axle was also located in front of the seat; that the Ford coupé is supposed to

be a two-passenger car, sometimes carrying three; that four or perhaps five could crowd in one of them, but usually only two people.

Lunsford, the driver of the car at the time of the accident in which the deceased was killed, testified:

"My occupation or business is welder and blacksmith. I was engaged in the same business during May, 1927. I have been in Pampa about since May 6th, 1927.

"I have known Della Todd and her sister, Mickey Todd; I have known Della about three and a half or four years and Mickey about a year and a half, I suppose. I don't know just exactly, maybe two years. I became acquainted with them at Vernon, Texas.

"On or about the 25th of May, 1927, I had occasion to take either one or both of these girls somewhere in an automobile. Mr. Roy Parker was with me on that occasion. As to what kind of car I had or owned at that time or was using, I will state that I had a Ford Coupe.

"The girls were staying, as far as I knew, at the Shuffield Hotel in Pampa. I know where the Shuffield Hotel is located with reference to Cuyler Street, that is, I know about; I don't know exactly. * * *

"This map here describes this (indicating) to be Barnes Street here, this street running in here to be Cuyler Street, that is the main street of the town. By this map which has been shown me by counsel, I would say that the Shuffield Hotel is located in Block sixty-six there. It is located at or about point 'B' as shown on there. I say that the girls were stopping at that place there. Now, this is south, the bottom of the page, the top of the page is north and east and west accordingly.

"As to how it happened that me and Mr. Parker went to get the girls that night, I will state that we had been out on the job and had went to town. We usually drive into town and we didn't have anything specially to do except go to town, so we went in to town and were standing around Ball Brothers' Café talking and something was said about us going to the dance. We had on our khakies, I didn't think about us even going when we went to town, and we got to talking about it and decided to go. The girls that day or at some time prior to that time had asked or requested us to come by and take them to this particular dance. We decided to go get the girls and go to the dance. I had been with them prior to that time in Pampa.

"As to where that was, I will state that once I took the girls to Wilcox, to a dance on Saturday night at Wilcox. As to how I happened to know they were in town, I will state that they came out to see my brother's wife the first time I knew it. I saw them personally the first time when they were put at a dance west of Pampa, out at Noelton, that was when I first saw them personally. As to what date it was that I took them to the dance at Wilcox, I will state that I can't remember, but it was on Saturday night before this accident happened at the next dance at Amaroda.

"As to what time of night it was when me and Parker went down to get the girls, I will state that it was after eight o'clock when we went down there to ask them to go with us, and I went down and got a shave and it must have

been after nine o'clock. I went to a shop, the only one that was open that night, and went to our blacksmith shop and went back up and it must have been after nine o'clock when we left.

"We went north, and the car was facing south when we stopped or after we stopped and went into the house to get the girls; we came to the west corner there. After the car was stopped it was facing south. We went over there about nine o'clock, stopped the car facing south and the girls did not come out, we went in and got them. As to how long we were there when we got there, I will state that we were there just a few minutes; they were ready to go. They were ready when we got there and all four of us got in the car.

"As to how we arranged ourselves in the car, I will state that I was driving, Miss Della was in the middle, Roy next to the door on the right hand side and Mickey was sitting kinda on Della's lap as near as she could without getting in my way and more on Parker's lap. That is the way we left the Shuffield Hotel.

"As to how we drove from the Shuffield in order to get out to the Amaroda Dance Hall, I will state that we came south one block, southeast I guess it would be, and turned to the right to Cuyler and went down. We went down this way, around this way and out this way (indicating). This (indicating) is Barnes Street. That is that street that leads out south from town directly to the oil fields.

"When we rounded that corner there, there was nothing to attract my attention to the right or the left. I don't know the width of that street at the street intersection. As to whether I could approximate it, I will state that I would imagine it is about fifty or sixty feet altogether. When we rounded this corner, as to which way we were from the place where we found out afterwards the culvert had been removed, I will state that we were to the right of it; we were to the right hand side of it. When we rounded that corner we were not in the middle of the street, we were on the right hand side. That was after dark. As to which way my lights faced with reference to that culvert, I will state that they faced to the right of it.

"Then we went on out to the dance hall. I don't know about what time we arrived at the dance hall but it was between nine-thirty and ten o'clock, I imagine. I didn't have any time piece. As to how long we stayed at the dance hall, I will state that we stayed until about one o'clock or a little after. During the time I was at the dance hall I did something besides dance with the girls; I played the violin a little while in the orchestra.

"While I was at the dance hall, both of the girls were not dancing with me; they danced with first one and then another; they also danced with me and Parker. I noticed them dancing with some one else.

"I say that it was a little after one, I will say, when we left. As to where we went after we left the dance hall and as to how we were arranged in the car, I will state that we were arranged in the same position as near as we could get as when we left. I went to the first corner south of town on Barnes, and turned on the Lefors road and took the road and went one mile and turned for one mile. We were just riding around and talking and turned back and went over the same road when we returned to town. As to about what rate of speed we were

traveling, I will state that we were just traveling at a moderate rate of speed, driving along slow. I am not positive as to the time we left the dance hall. It could have been later than I stated but it wasn't any earlier.

"I said that I came south to where the Lefors road turns off; that is the road that we take to come over to the court house and then we went a mile east and a mile south and then turned around and came back.

"As to what the condition of the street was, Barnes Street, immediately south of where the accident finally occurred—It occurred right here in this corner (indicating). As to what the condition of that street was south of there with reference to being rough or smooth, or as to what the condition of it was, I will state that it was rough. I will state that there is a concrete culvert fairly well washed out right about in this place (indicating); it was along probably up in here. That is about a block or so after I made the turn from the Lefors road to come into it. From the point of the concrete culvert on up, as to about what distance that is, I would say it is a little over a block, probably a block and a half; it is a block and a half or so between that point, and I say that it was rough.

"As to what rate of speed I was driving the car there from the time I passed that concrete culvert on up to where the accident actually occurred as close as I could judge, I would say between fifteen and eighteen miles an hour. As to whether any cars passed us at all about that concrete culvert, I will state that one passed me going into town and I met another one just after he passed me. As to whether I know who was in the car that was going to town, I will state that Lomax and the Nolen brothers were in there. Mr. Lomax testified here at the former trial of the other case. As to about how fast I would judge he was going when he passed me, I will state that I don't know; I didn't pay any particular attention to him.

"When I approached the intersection there of Cuyler Street with Barnes Street, as to what, if anything, I noticed with reference to the surface of the street about the point where I afterwards found out there was a ditch, I will state that the first thing I noticed was—it looked to me like a little fresh dirt, as well as I remember —I don't remember exactly how it looked—it all just flashed in my mind. I was driving on the right hand side going slow on account of it being rough, and the first thing I knew I looked right down in front of me, on account of the way that street was, and it just flashed up in front of me all at once and it appeared to me that a grader had been by there or something. The next thing I discovered was a ditch.

"As to how far I suppose I was from the ditch when I first found out that there was a ditch there, I will state that I couldn't say exactly. I would just say I was around ten or twelve or maybe fifteen feet.

"When I went down Cuyler on the afternoon or evening, that same evening preceding this occurrence in the early morning, as to whether I remember any grading having been done on Cuyler Street at all about that point, I will state that I do. I say that when I turned up Barnes Street in the morning I noticed that grading. When I first noticed it as being graded, I could not at that time tell that there was a ditch behind it; you couldn't tell until I run into it. When I got within ten or twelve or fifteen feet there, I noticed there was a ditch there and I say that I was traveling on the right hand side of the street going north. In order to get it clear, I was right along here on the right hand side of the street. When I got here within —at point 'A' shown on the map, within ten or fifteen feet of the culvert, I saw it was a ditch.

"As to what I did then, I will state that I tried to stop and miss it; I seen I was too close, and I thought I could turn to the left and I turned as fast as I could and slid into it. As to what happened then, I will state that the right front wheel hit in the ditch. It first knocked the radius rod back and it seemed like the car just kinda turned over the right front wheel as near as I could get at it, sliding into the ditch together, and it overturned. The car overturned.

"As to what happened when the car overturned, that is, as to how it turned over, to the front or how, I will state that it turned over kinda to the front and side, more to the side. The right front wheel came back down under us, kinda doubled down under that way (indicating). As to whether any portion of the wheels or any portion of the tire hit any portion of the ditch, I will state that the right front wheel hit it first.

"Now, assuming that this is Cuyler Street here—we will put it on a little bigger scale— this is Barnes Street here (indicating). As to where the ditch was that I spoke of, I will state that it was across there (indicating); it was running practically parallel to Cuyler Street. The ditch was right across here (indicating).

"I say that I was traveling in this direction on the right hand side, and when I got within ten or twelve or fifteen feet of it, or so, I put on my brakes and turned to the left; and that the car went into the ditch, hit this bank here (indicating) and turned over; broke the front radius rod I said."

The above somewhat lengthy statement is given that it may clearly appear therefrom upon what grounds defendant's claim of error is based.

The jury found that the city of Pampa, through its agents and officers, was negligent in the way and manner in which it removed the culvert or bridge and left the ditch across the street, and in failing to place lights or warning signals at or near the ditch, and that the death of Mickey Todd was proximately caused by the said negligence of the city of Pampa.

The defendant tendered to the court, in season, the following special issue numbered 2:

"(1) Did the witness Lunsford exercise ordinary care just prior to the time of said alleged accident to keep a proper outlook for the ditch caused by Defendant City's having removed said culvert? Answer Yes or No.

"(2) If you have answered the above question in the affirmative, you need not answer this question, but if you have answered it in the negative, state: Was such negligence on his part, if any you have found, the sole, proximate cause of the injury in question? Answer Yes or No."

This special issue the trial court refused to submit to the jury.

From these proceedings, it will be seen that the defendant was not permitted to submit to the court and jury its defense pleaded that the negligence of the driver of the car, Lunsford, was the sole, proximate cause of the death of Mickey Todd.

It may seem paradoxical that the ditch left open and unguarded by the city should not be deemed the proximate cause of the accident, yet, while the open ditch was a potential threat of disaster to any one driving along the street, it was possible that without the negligence of the driver of the car, if he was negligent, this accident would not have occurred, and the open ditch would have been rendered harmless by the exercise of ordinary care on the part of such driver.

The negligence of the driver of the automobile would not be imputed to the guest unless such negligence was the sole, proximate cause of the death of the deceased. Southwestern Bell Telephone Co. v. Doell (Tex. Civ. App.) 1 S.W.(2d) 501, 506; Northern Texas Traction Co. v. Woodall (Tex. Com. App.) 299 S. W. 220.

It is true that the negligence of the city in opening and uncovering the ditch, concurring with the negligence of the driver of the car, if any, might, under proper instructions, have permitted a recovery against the city, but that question is not before us. Amarillo Traction Co. v. Russell (Tex. Civ. App.) 290 S. W. 905.

We do not mean to say that the negligence of the driver would ordinarily be imputed to his guest, but we do say that if such negligence was the sole proximate cause of the accident, which resulted in the death of Mickey Todd, then certainly the negligence of the defendant was not the proximate cause of her death, and this issue should have been submitted to the jury, as the defendant was entitled to an affirmative presentation of its defense. M., K. & T. Ry. Co. v. McGlamory, 89 Tex. 635, 35 S. W. 1058; Northern Texas Traction Co. v. Woodall, supra.

This is true even though the jury may have found the defendant guilty of negligence in another issue submitted to them. Montrief & Montrief v. Bragg (Tex. Com. App.) 2 S.W. (2d) 276.

The deceased is shown to have been, from time to time, a waitress in a café, and is also shown to have worked at times on the farm of her parents and to have been of some assistance to her parents. The plaintiffs offered in evidence the fact that deceased, shortly before her death, had applied to the hospital for a position as a nurse. This was objected to by defendant on the grounds:

" * * * The answer sought to be elicited for the reason that under the state of the pleadings, plaintiffs' recovery, if at all, is limited to the pecuniary benefits the parents would derive, would have earned or received from the earnings of the deceased, and the proper test is as to what the deceased had earned up to the date of her death and not what she might earn or what she intended to at a time subsequent to the date of her death, the date it actually occurred, for the reason that all such evidence would be but the conclusion of the deceased, would be too remote, speculative, and in the nature of a conjecture."

This evidence was entirely too remote to establish the future earnings of deceased and should have been excluded. Bonnet v. Galveston, H. & S. A. Ry. Co., 89 Tex. 72, 33 S. W. 334, 336.

The remarks of the attorney for plaintiffs, in his argument before the jury, were not permissible, as they applied to the poverty of the parents and the ability of the city to pay damages, but we will not enter into an extended discussion of this question, in view of the disposition we make of the case, because we feel that it will not be repeated.

Other propositions presented may not arise on another trial, and therefore we do not discuss them. Those that are presented, that involve alleged error other than those discussed above, are hereby overruled.

For the errors indicated, the judgment of the trial court is reversed, and the case is remanded to that court for a new trial.