545 F.2d 886
 Maryanna DICKENS, Individually and as next friend of Anna
Rachel Dickens and Rose Marie Dickens, minors, et
al., Plaintiffs-Appellees-Cross Appellants,
v.
UNITED STATES of America, Defendant-Appellant-Cross Appellee.
 No. 74-3084.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 20, 1977.
 
 Anthony J. P. Farris, U. S. Atty., W. Boone Vastine, II, Asst. U. S. Atty., Houston, Tex., Robert D. Batson, Trial Atty., Aviation Unit, Tort Section, Civil Div., Dept. of Justice, Washington, D. C., for appellant.
 Joseph D. Jamail, John Gano, Robert F. Stein, Houston, Tex., for appellees.
 Appeals from the United States District Court for the Southern District of Texas.
 Before GODBOLD, RONEY and HILL, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 The Government appeals a $1,250,000 wrongful death judgment entered by the district court, sitting without a jury, under the Federal Tort Claims Act. Plaintiffs' decedent was killed in a private airplane which crashed while attempting to land at Austin, Texas. The claim is based on the alleged negligence of a Government aircraft controller in failing to warn the pilot of the possible existence of wake turbulence created by an immediately preceding jet aircraft landing. The major thrust of the Government's appeal contests the findings of fact of the trial court. Both parties assert legal error in the amount of damages. We affirm.
 
 
 2
 This kind of case, although difficult and time consuming in decision, lends itself to a Local Rule 21 affirmance as to the bulk of the case once the decision to affirm is made. The most serious controversy on appeal involves whether the district court was clearly erroneous in its findings of fact. In this case, once it is decided that the district court's judgment is based on fact-findings which are not clearly erroneous, an opinion would clearly have no precedential value, except perhaps as to one matter of law concerning the amount of the judgment. After a careful reading of the record, reconsideration of the briefs following extended oral argument, and listening again to recorded tapes of the oral argument, we are convinced that the district court was not clearly erroneous in its findings of fact and that no error of law appears. Although Rule 21 affirmance would be sufficient, in order to avoid any misconception of the premises upon which the decision is made in this difficult case, it is appropriate that we briefly discuss all of the points raised.
 
 Facts
 
 3
 On April 22, 1970, a twin engine converted Excalibur aircraft crashed near the Austin Municipal Airport in Austin, Texas. The aircraft was piloted by Dr. Robert G. Farris, a practicing neurosurgeon, who was returning from a professional meeting in Washington, D.C. The aircraft carried five other passengers including plaintiffs' decedent, Jimmy Dickens, a medical student at the University of Texas in Galveston. His wife and children are plaintiffs in this case. All passengers perished in the accident, along with two other persons who were killed when the plane crashed into their home.
 
 
 4
 While making a routine landing approach, the Excalibur, just prior to touchdown, made an abrupt vertical ascent of approximately 75-100 feet. The pilot at that point apparently aborted the landing attempt. Witnesses testified that the aircraft veered 20 to 30 degrees right of the runway's axis and proceeded in level flight about one-third the length of the runway. At that point, the aircraft made two successive right turns. A third right turn was initiated by an extremely high bank angle which apparently caused the aircraft to stall and crash into a home near the airfield.
 
 
 5
 Two factors at the time of landing are important in the consideration of this case. As the aircraft came in for its first landing attempt, the landing gear was up, a condition which would activate a horn inside the cockpit when the aircraft is flying near landing speed. Just prior to the Excalibur's approach a Braniff jet landed on a runway which is contiguous to and intersects with the runway Dr. Farris was using. When a large jet plane lands, it creates air turbulence (wing tip vortex) which continues for a few minutes after landing and can affect the landing of a small plane caught in its wake.
 
 
 6
 The parties offer two theories as to the cause of the crash: first, that the prior landing jet's wake turbulence caused the sudden veering and vertical ascent of the aircraft resulting in loss of control by the pilot and the eventual crash. On this theory, the plaintiff claimed that the aircraft controller negligently failed to warn the landing pilot of the possibility of air turbulence, and that this failure to warn was a proximate cause of all else that followed.
 
 
 7
 The second theory, the Government's, is that the pilot was distracted by the landing gear horn activated when he attempted a landing without his landing gear being down, and that he abruptly changed the aircraft's attitude to avoid a gear-up landing. In his attempt to go around and make another landing, he caused the aircraft to crash by rolling in too much bank for the low air speed causing an unrecoverable stall.
 
 
 8
 The district court made explicit findings of fact on disputed evidence and held for the plaintiffs on the first theory.
 
 
 9
 The Government contests these findings in two ways. First, it contends that the court was clearly erroneous in finding that the Excalibur aircraft encountered wake turbulence as it attempted to land. The evidence compels a finding, it argues, that the time interval between the landing of the large commercial jet and the landing of the private aircraft was too great for the wake turbulence to affect the Excalibur. The Government concedes that if the landings were but three minutes apart, as found by the trial court, the turbulence could adversely affect the Excalibur's landing. It contends, however, that the landings were in fact six minutes or more apart, a separation generally agreed sufficient to dissipate the air turbulence.
 
 
 10
 Second, the Government argues that, assuming arguendo the duty of the aircraft controller to advise the Excalibur of the possibility of wake turbulence, the breach of that duty was not a proximate cause of the accident. The evidence, it asserts, does not support the finding that the pilot panicked, but rather shows that the pilot was in control of the aircraft after the aborted landing. Further, the Government contends that the rapid ascent of the aircraft was from pilot input rather than wake turbulence.
 
 
 11
 At this point it is important to note the standard of review to be given findings challenged as clearly erroneous under Fed.R.Civ.P. 52(a). The appellate court's function is not to retry the issues. Reviewing courts must constantly bear in mind that their function is not to decide factual issues de novo. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). A finding of fact cannot be set aside as clearly erroneous merely because another court may give the evidence a different construction or resolve the ambiguities differently. United States v. National Ass'n of Real Estate Bds., 339 U.S. 485, 495, 70 S.Ct. 711, 94 L.Ed. 1007 (1950). Nor can an appellate court reverse where the evidence would support a conclusion either way. Where the trial court has decided to weigh the evidence more heavily for plaintiffs, a choice between two permissible views of the weight of the evidence is not clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 341, 70 S.Ct. 177, 94 L.Ed. 150 (1949). A finding of fact, however, is clearly erroneous when, although there is evidence to support it, on reviewing the entire record one is left with the definite and firm conviction that a mistake has been committed. United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746, reh. denied, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147 (1948); see also Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Standefer v. United States, 511 F.2d 101, 105 (5th Cir. 1975).
 
 
 12
 Within this narrow framework for review, we must decide as to each factual issue if, viewing the record as a whole, we are left with a definite and firm conviction that a mistake has been made.
 
 Wing Tip Vortex
 
 13
 The first issue is whether the court erred in finding that the Excalibur encountered wake turbulence at the runway intersection when it attempted to land. The district court made a finding that wake turbulence was present and the plane encountered the turbulence.
 
 
 14
 Aircraft wings provide lift to the aircraft. Such lift is obtained by designing the wing to create a condition of low pressure on the upper surface of the wing and corresponding high pressure on the lower surface of the wing. This condition is achieved by design curvature of the wing. The lower surface is flat to allow a greater quantity of airflow in a shorter period of time. The upper surface is convex to force the air to travel a correspondingly longer distance than on the lower surface causing rarification of the air which produces lower pressure on the upper surface than is present with the more dense air on the lower surface. A resulting force in the up direction known as lift is created. Because of the difference in pressure at the wing tip, the higher pressure from below spills onto the upper surface of the wing. In flight, such movement of the air creates a vortex trailing behind each wing tip, with each vortex resembling a horizontal cyclone behind the wings. As an aircraft lands, the turbulence created by the vortex moves counter-clockwise from the right wing and clockwise from the left wing. The force and duration of the turbulence is a function of the size and speed of the aircraft and the velocity and direction of surface winds.
 
 
 15
 The parties agree that the direction of the wind would certainly push the turbulence caused by the landing jet in the vicinity of the Excalibur's runway. The critical question is whether the separation time between landing aircrafts was sufficient to allow the turbulence to have passed the subject intersection and thus be of no consequence to the Excalibur. This determination, by necessity, must come from a distillation of eyewitness accounts, recorded evidence and conclusions based on mathematical probabilities, presumptions and calculations.
 
 
 16
 The Government argues that because of the district court's erroneous determination that less than three minutes separated the two landings, the court erroneously found that the Excalibur encountered turbulence. The troublesome problem here is how to make an accurate determination of aircraft separation. Since no times corresponding to voice transmissions were simultaneously impressed upon the FAA communications tape, the resolution of this question is speculative at best. The district court bases its conclusion on the testimony of eyewitnesses and interpolation between certain times related by those witnesses. The Government bases its case on interpolation of times between transmissions and the tapes of certain other conversations. There is testimony to show that minutes later impressed on the tapes were inaccurate to the extent that they averaged approximately 64 seconds. Both methods used to determine the time interval are subject to error. The district court credited the live testimony over the recorded evidence. We are not convinced the court was clearly erroneous in the resolution of this conflict. We cannot reverse the district court merely because we might resolve ambiguities differently. Accordingly, we find it to be reasonably plausible that the Excalibur encountered wake turbulence while attempting to land, and we cannot say that the district court was clearly erroneous in its conclusion.
 
 Proximate Cause of the Accident
 
 17
 A finding that the Excalibur encountered wake turbulence does not of itself make the Government liable. It must be shown that the turbulence caused the pilot to lose control of his aircraft; that the loss of control caused the pilot to crash; and that the pilot's failure to receive warning from the air controller proximately caused the disastrous effect of the air turbulence encounter on the pilot's management of the aircraft.
 
 
 18
 There is substantial credible evidence in the record to support the district court's finding that wake turbulence was the proximate cause of the accident. Two qualified experts testified on matters relevant to such determination. A professor of aeronautics at the University of Texas testified that from his calculations the time interval between landings was 1 minute and 50 seconds. This testimony is corroborated by certain eyewitness reports. He further testified that in his expert opinion the amount of wake turbulence that would have been in the area of the runway would have adversely affected the Excalibur and in his opinion did cause the landing emergency. Another qualified expert, a pilot and an aeronautical engineer, testified that using his pilot's computer and the data furnished him, the separation was 1 minute and 36 seconds. Further, he testified that in his expert opinion the pilot never regained control of the aircraft after the wake encounter. Translated into legal effect, this testimony attributes proximate cause to the wake encounter.
 
 
 19
 At this juncture, the question now becomes whether the air traffic controller was negligent in the performance of his duties. His negligence would be imputed to the Government. There is no evidence to show that the tower controller gave any warning as to the possibility of an encounter with wake turbulence generated by the Braniff jet. The question is whether, under the facts of this case, he had a duty to warn.
 
 
 20
 At the time of the crash, the controller's manual, paragraph 255, provided for wake turbulence warning:
 
 
 21
 Issue cautionary information to aircraft concerned, if in your opinion wake turbulence will have an adverse effect on it.
 
 Phraseology:
 CAUTION WAKE TURBULENCE (emphasis added)
 
 22
 Department of Transportation, Federal Aviation Administration Pub. No. 7110.8A, February 1, 1970. The traffic controller therefore was under a duty to warn the landing pilot of possible dangerous wake turbulence. The evidence in the record that tower controllers are trained to recognize the hazards of wake turbulence, together with evidence of the close proximity of landing time, support the finding that the danger was foreseeable.
 
 
 23
 Since the Government is the alleged tortfeasor, its liability is determined by reference to the Federal Tort Claims Act. 28 U.S.C.A. § 1346(b). Under the Act, the liability of the United States must be determined in accordance with the law of the state where the asserted negligence occurred. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Generally, liability growing out of the operation of an aircraft is to be determined by the ordinary rules of negligence and due care. United States v. Schultetus, 277 F.2d 322, 325 (5th Cir. 1960); 8 Am.Jur.2d Aviation § 92 (1963). The well-settled negligence rule in Texas is that " ability to have foreseen and prevented the harm is determinative of responsibility." 40 Tex.Jur.2d, Negligence § 10 at 453 (1962). Thus, under Texas law and the facts as determined by the trial judge, there was an actionable breach of duty to warn the pilot so that the finding of liability for negligence must be sustained.
 
 Damages
 
 24
 The district court assessed total damages at $2,500,000 and then reduced the amount by one-half for the purposes of judgment against the Government because the plaintiffs had settled with the pilot's estate. On the one hand, the Government contends that the finding of $2,500,000 damages is excessive. On the other hand, the plaintiffs contend the amount should not have been reduced by half.
 
 
 25
 The Government's contention is based on the argument that the finding that plaintiffs' decedent would become a surgeon is too speculative as a matter of law. The Government relies on two early Texas cases. In Bonnet v. Galveston, H. & S. A. Ry., 89 Tex. 72, 33 S.W. 334, 336 (1895), a road gang member was preparing himself to become a machinist or an engineer. The Supreme Court of Texas held "(t)he probability of his becoming an engineer or machinist was too remote, contingent, and speculative to throw any light upon his probable future earnings." In City of Pampa v. Todd, 11 S.W.2d 247 (Tex.Civ.App. Amarillo 1928, writ dism'd), a waitress had applied to the hospital for a position as a nurse. The court held this evidence to be "entirely too remote to establish the future earnings of deceased." There is, however, a substantial difference between the facts of these cases and the case at bar involving a superior medical student who had survived the rigorous early years of his medical education, had prepared a sophisticated paper on neurosurgery, and showed a clear interest in and aptitude for becoming a surgeon.
 
 
 26
 The Texas courts follow a case-by-case rule that leaves considerable discretion in the trial court as to the admissibility of the kind of evidence presented in this case. The Supreme Court of Texas stated in McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710 (1943), at p. 712:
 
 
 27
 In a personal injury suit the amount which the plaintiff might have earned in the future is always uncertain, and must be left largely to the sound judgment and discretion of the jury. * * * It must be an intelligent judgment, based upon such facts as are available. * * * No general rule can be laid down, except that each case must be judged upon its peculiar facts, and the damages proved with that degree of certainty of which the case is susceptible. * * * Under this rule the required certainty of the proof will necessarily vary. Where plaintiff is a child, who has never earned any money, the jury must determine the value of its lost earning capacity altogether from their common knowledge and sense of justice.
 
 
 28
 Accord, Fowler v. Pedlar, 497 S.W.2d 399 (Tex.Civ.App. Houston (1st Dist.) 1973, writ ref'd n. r. e.); Bell Aerospace Corp. v. Anderson, 478 S.W.2d 191 (Tex.Civ.App. El Paso 1972, writ ref'd n. r. e.); Consolidated Casualty Ins. Co. v. Smith, 309 S.W.2d 80 (Tex.Civ.App. Houston 1958, writ ref'd n. r. e.).
 
 
 29
 Viewed in the light most favorable to the award, the evidence of a future surgical career was sufficiently probative to be considered by the trial court.
 
 
 30
 The plaintiffs' cross-appeal asserts that under Texas law it was error to divide the actual amount of damages by one-half. Plaintiffs obtained a settlement with the pilot's estate and the court used the settlement as a basis to reduce the instant damage award by one-half. This issue is controlled by the rule in Palestine Contractors, Inc. v. Perkins, 386 S.W.2d 764 (Tex.1964). Damages against one joint tortfeasor must be reduced by one-half when there has been a settlement on the part of the other joint tortfeasor. This holding is followed in our Circuit:
 
 
 31
 Under Texas law if the pilot was a joint tortfeasor the settlement with his estate by the plaintiffs entitled the government to a reduction of the judgment against it by one-half.
 
 
 32
 Gill v. United States, 429 F.2d 1072, 1078 (5th Cir. 1970).
 
 
 33
 A final point asserted by the Government may find this opinion deciding a point of first impression in this Circuit. The Federal Tort Claims Act in pertinent part provides:
 
 
 34
 Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim . . . .
 
 
 35
 28 U.S.C.A. § 2675(b).
 
 
 36
 The administrative claim filed with the government agency was for $2,300,000. The complaint alleged a claim for $2,300,000. The judge assessed damages at $2,500,000. He then entered judgment for one-half that amount, $1,250,000, against the Government. Although the plaintiffs might well be limited to a $2,300,000 judgment against the Government, the $1,250,000 judgment is within that amount. We think the statute does not prevent proof of damages in excess of the amount of the administrative claim, but only prevents assertion of a claim and judgment against the Government in excess of that amount. The amount of judgment against the Government being less than the amount of the administrative claim, we find no error in what was done here. Presumably the court could have found damages in the amount of $4,600,000 and by limiting the judgment to one-half of that sum, allowed recovery against the Government for an amount within the administrative claim.
 
 
 37
 AFFIRMED.