662 F.2d 326
 Anne W. SWOBODA, individually and as the Personal
Representative of the Estate of Gerard S. Swoboda,
Deceased, Plaintiff-Appellee Cross-Appellant,
v.
UNITED STATES of America, Defendant-Appellant Cross-Appellee.
 No. 79-3665.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Nov. 23, 1981.
 Ronald R. Glancz, Aviation Unit, Torts Section, U. S. Dept. of Justice, Susan A. Ehrlich, Anthony J. Steinmeyer, Linda Jan S. Pack, U. S. Dept. of Justice, Civ. Div., Appellate Staff, Washington, D. C., for defendant-appellant cross-appellee.
 Bunnell & Denman, James B. Denman, Fort Lauderdale, Fla., Clifford B. Wentworth, Hollywood, Fla., for plaintiff-appellee cross-appellant.
 Appeals from the United States District Court for the Southern District of Florida.
 Before FRANK M. JOHNSON, Jr., HENDERSON and THOMAS A. CLARK, Circuit Judges.
 FRANK M. JOHNSON, Jr., Circuit Judge:
 
 
 1
 Plaintiff Anne Swoboda filed a wrongful death action under the Federal Tort Claims Act, 28 U.S.C.A. § 1346 et seq., and the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq., alleging that the Federal Aviation Administration (FAA) proximately caused the death of her husband, Gerard Swoboda, by negligently failing to institute proper rescue procedures after the decedent's plane crashed off the coast of Alaska. The district court found in a non-jury trial that both the government and the decedent were negligent and that the negligence of each was a 50 percent proximate cause of death. The Government appeals and the plaintiff cross-appeals, each contending that the other's negligence was the sole proximate cause of death. Because we conclude that the district court's findings of negligence on the part of the government are clearly erroneous, we reverse.
 
 
 2
 Gerard Swoboda, an experienced pilot, contracted with Transavia International to ferry aircraft from Taiwan to New Mexico via Midway Island and Adak, Alaska. Prior to his fateful trip, Swoboda had twice flown aircraft successfully over the identical route. On September 22, 1975, at 17:26 Greenwich Mean Time (GMT), Swoboda's and two other aircraft flying the same route departed Midway for Adak. Swoboda's flight plan indicated that the trip would take eight hours, that his estimated time of arrival at Adak was 01:26 GMT, that his plane contained enough fuel for eleven hours of flight and that his alternate destination in the event that Adak could not be reached was Cold Bay, Alaska. Ninety minutes after takeoff, Swoboda advised Honolulu Aeronautical Radio (ARINC) that he was experiencing difficulties with his radio and could no longer transmit on Very High Frequency (VHF), but retained the ability to transmit on High Frequency (HF).[1] Because of these transmission difficulties, Swoboda communicated with the other two planes by pressing his hand-held Emergency Locator Transmitter (ELT) once to signify "yes" and twice to signify "no".[2] At 19:55 GMT, responsibility for monitoring the planes was transferred from Honolulu to the Anchorage Air Route Traffic Control Center (Anchorage Center) although the planes remained in contact with Honolulu. Swoboda made a required position report to Honolulu at 20:36 GMT on HF and estimated that he would arrive at the next compulsory reporting position in an hour. That was the last verbal message received from Swoboda. At the next compulsory reporting position, one of the companion aircraft notified Honolulu ARINC that operations for the three planes were normal.
 
 
 3
 Five hours outside of Midway, at 22:38 GMT, one of the companion planes wired Honolulu that Swoboda no longer had transmission capabilities on either HF or VHF but that he was not in difficulty since no distress signal had been heard. Honolulu was also informed that Swoboda had been communicating with the planes by turning his portable ELT on and off.[3] At 00:40 GMT, less than an hour before Swoboda's projected arrival time at Adak, a military aircraft heard an ELT signal emanating at fifteen minute intervals. The military aircraft contacted the other two planes, informed them of the intermittent signal and gave the coordinates for the location of the strongest ELT signal. At 00:52 GMT, FAA officials at Anchorage Center issued an INCERFA or "uncertainty" bulletin concerning Swoboda's plane because of his failure to make a position report. Three minutes after the "uncertainty" bulletin, at 00:55 GMT, one of the companion planes notified Anchorage Center that the military aircraft had heard an ELT signal emanating from Swoboda's aircraft but that the signals were Swoboda's "way of telling us he (is) ok." As a result of the message from the companion plane that Swoboda was not in distress, Anchorage Center canceled the INCERFA. The INCERFA was reinstated 45 minutes later after Swoboda was again overdue for a position report. The companion planes landed at Adak and the pilots informed FAA officials at Anchorage Center that Swoboda had probably flown to the alternate destination, Cold Bay. At 03:00 GMT, shortly after Swoboda's estimated arrival time at Cold Bay, an ALERFA or "alert" bulletin was issued concerning the missing plane and at 04:50 GMT, 30 minutes after the estimated exhaustion of Swoboda's fuel, a DETRESFA or "distress" bulletin was issued.
 
 
 4
 The Search and Rescue Coordinator at Adak dispatched a Navy P-3 aircraft equipped with sophisticated electronic and night search equipment in an attempt to locate Swoboda's ELT signal.[4] FAA officials at Anchorage Center had, however, provided the rescue coordination center with the incorrect coordinates for Swoboda's location, causing the Navy P-3 to begin searching 700 miles north of Swoboda's last reported position. The following day, six aircraft were utilized over a broad area, again in a vain attempt to locate an ELT transmission. On September 27, after five days of search and rescue operations, a Coast Guard aircraft sighted a yellow life raft belonging to the downed pilot 18 miles south of Adak. The search was narrowed to the general vicinity of the raft and searches of the nearby islands were implemented. After twelve days, search and rescue operations were discontinued without having located Swoboda. The entire search, which involved eleven aircraft and six vessels, covered an area of over 300,000 miles. The district court found that the government's agents were negligent for violating FAA regulations by failing to promptly notify the Search and Rescue Coordinator after receiving the report from a companion plane that the military aircraft had heard Swoboda's ELT signal, for failing to promptly report to the Search and Rescue Coordinator that Swoboda was overdue at Adak and for failing to supply the Search and Rescue Coordinator with the correct coordinates for Swoboda's last known position. The court concluded that the government's negligence constituted a 50 percent proximate cause of death and awarded a judgment for the plaintiff in the amount of $225,000.
 
 
 5
 Plaintiff contends that the failure of Anchorage Center to notify the Search and Rescue Coordinator of the report received from the military aircraft concerning Swoboda's ELT signal violated FAA regulations and amounted to negligence per se. To constitute negligence per se, (1) there must be a violation of a regulation; (2) causing the type of harm that the regulation was intended to prevent; and (3) injuring a member of the class of persons intended to be protected by the regulation. Manning v. M/V "Sea Road," 417 F.2d 603 (5th Cir. 1969); Marshall v. Isthmian Lines, Inc., 334 F.2d 131 (5th Cir. 1964). A finding of negligence per se does not, however, terminate the inquiry. A court must determine whether the violation of the regulation was somehow rendered excusable. Reyes v. Vantage Steamship Co., Inc., 558 F.2d 238 (5th Cir. 1977), modified, 609 F.2d 140 (1980). Regulations require FAA facilities to notify the appropriate rescue coordination center when an ELT signal is received or reported.[5] Further, FAA officials are required to treat a situation as an emergency whenever doubt exists.[6] By failing to notify the rescue coordination center of Swoboda's ELT signal, FAA officials did, in fact, violate the express language of the regulation. Assuming without deciding that the violation of the regulation amounted to negligence per se, we find that the violation was, under the circumstances, excusable.
 
 
 6
 The facts surrounding Swoboda's ELT transmission demonstrate that Anchorage Center reasonably believed that the signal was not intended to indicate distress. The Assistant Chief in Charge at Anchorage Center testified that Anchorage Center receives three or four reports of ELT signals daily and that not every report of an ELT signal means that an aircraft is in distress. The signal emanating from Swoboda's plane had been heard by a military aircraft and reported to one of the companion planes. The companion plane informed Anchorage Center of the ELT signal but also stated that Swoboda was using the ELT not as a distress signal but as a method of indicating that he was "ok". FAA officials knew that Swoboda's radio was not functioning, knew that he had been using his ELT transmitter to communicate with the other two pilots and knew that on at least two prior occasions one of the companion planes had made position reports for Swoboda. Thus it was reasonable for FAA officials to rely upon the companion plane's message that Swoboda's ELT transmission did not signify distress but was instead a means of communicating. Additionally, the ELT transmission occurred at 15-minute intervals although the proper procedure for indicating distress is to employ a continual transmission. While the use of an intermittent signal may have been a reasonable means of conserving limited battery power, the absence of a continual transmission reinforced Anchorage Center's conclusion that Swoboda was communicating with the other planes as planned through the use of his ELT and not signaling distress.
 
 
 7
 The plaintiff also avers that FAA officials were negligent for failing to notify the Search and Rescue Coordinator when Swoboda's plane was overdue at Adak and for supplying the rescue control coordinator with incorrect location information.[7] The duties of FAA air controllers are set forth in the various air controller manuals and violation of those duties can constitute negligence. See Dickens v. United States, 545 F.2d 886, 892 (5th Cir. 1977); Gill v. United States, 429 F.2d 1072, 1075 (5th Cir. 1970); accord, Zabala Clemente v. United States, 567 F.2d 1140, 1147 (1st Cir. 1977). The manual states that the FAA has the responsibility for assuring that search and rescue operations will be initiated if an aircraft is overdue or fails to make position reports.[8] The FAA is also required to alert the appropriate rescue coordination center in the event of an emergency and supply the center with all available information concerning the aircraft.[9] Thus FAA regulations place a duty upon air controllers to exercise reasonable care in supplying rescue coordination centers with complete and timely information concerning aircraft that are overdue or in distress. A review of the record demonstrates that the FAA did exercise reasonable care in notifying the proper authorities of Swoboda's difficulties.
 
 
 8
 The trial court found that the FAA failed "to transmit the correct location information (of Swoboda's plane) to the Search and Rescue Coordinator ...". To the extent that the information was inaccurate, the inaccuracies did not result from a lack of due care on the part of the FAA. Anchorage Center received the incorrect position report from one of the companion planes and simply relayed it to the rescue coordination center.[10] A duty to supply complete information does not require the FAA to warrant the accuracy of the data. Only if the inaccuracy resulted from a failure to exercise reasonable care may the FAA be found negligent for transmitting incorrect data to the rescue coordination center. However, even assuming that the FAA negligently supplied incorrect location coordinates for the plane, the negligence did not proximately cause Swoboda's death. Despite the incorrect coordinates, the Navy P-3 Aircraft actually searched the area where Swoboda's life raft was later found. In fact, had the search occurred at the correct coordinates, the Navy P-3 aircraft would have been dispatched to an area over seven-hundred miles south of the location of the life raft.
 
 
 9
 Similarly, the FAA's failure to promptly notify the Search and Rescue Coordinator of the missing plane by issuing a DETRESFA or "distress" bulletin as soon as Swoboda's plane was overdue at Adak does not constitute negligence. An hour before the estimated arrival time of Swoboda's plane, Anchorage Center received assurances from one of the companion planes that Swoboda was "ok". When he failed to arrive at Adak, Anchorage Center still had no concrete indication that Swoboda was in distress; in fact, Anchorage Center was informed by one of the companion planes that Swoboda had probably gone on to the alternate destination, Cold Bay. Thus the FAA had no evidence that Swoboda was in distress and had reason to believe that his failure to land at Adak occurred because he flew to the alternate destination. FAA officials were not, therefore, negligent for failing to issue the distress bulletin as soon as Swoboda's plane was overdue at Adak.
 
 
 10
 Although a more timely search in the proper area would probably have increased the likelihood of a successful rescue, the delay in the search cannot be attributed to any negligence on the part of the employees of the government. Based upon the information in its possession, particularly repeated assurances from the companion planes that Swoboda was not in distress, the actions by the government's employees can only be viewed as reasonable.
 
 
 11
 REVERSED.
 
 THOMAS A. CLARK, Circuit Judge, dissenting:
 
 12
 The majority reverses the district court judge on three separate findings of government negligence. This court holds that the district judge, after listening to all the testimony and reviewing all the evidence, was clearly erroneous not once but three times. To reverse a trial court on a finding, the appellate court must be "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Company, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This is a close case which is all the more reason that this court should not substitute its judgment for that of the district court judge. Because I do not find that the district court was clearly erroneous in the three findings of fact, I would affirm and thus I must dissent.
 
 I.
 
 13
 The government, in the form of the FAA, was negligent, first, in failing to notify the Search and Rescue Coordinator when a report was received that Swoboda was transmitting an ELT signal. This conduct was in clear violation of FAA rules.[1] Substantial evidence in the record supports the trial judge's determination that this conduct was a proximate cause of Swoboda's death. The requirement that the Search and Rescue Coordinator be notified when an ELT is received is clearly aimed at preventing exactly the kind of tragedy that occurred here. Negligence per se was established.[2]
 
 
 14
 The majority's reliance on the excuse doctrine is misplaced. As this court has previously indicated, the doctrine is an extremely narrow one.
 
 
 15
 Violation of a safety statute may be excused under certain circumstances. Thus where non-compliance was due to an emergency situation, or where compliance would be more dangerous than non-compliance, strict compliance has been excused. See Chase v. Tingdale Bros., 1914, 127 Minn. 401, 149 N.W. 654 (child dashes into the street); Cameron v. Stewart, 1957, 153 Me. 47, 134 A.2d 474 (walking on the wrong side of the street where sidewalk is defective). There has been no showing of any justification for failure to comply with the statute here. Indeed, the only explanation for the breach was the belief by the Captain that the line-throwing appliance was illegal, a completely mistaken belief.
 
 
 16
 Reyes v. Vantage Steamship Co., 558 F.2d 238, 243 (5th Cir. 1977), modified, 609 F.2d 140 (1980). The majority uses this doctrine as a jumping off point into an inquiry as to the reasonableness of the government's action: its negligence. In short, the court disagrees with the district court's finding that the government unreasonably relied on Swoboda's companions. Although the facts support the trial judge's result, the majority substitutes its concept of reasonableness for the trial court's. The imaginative use of the "excuse" doctrine does not convert the majority's substitution of judgment on factual findings into a correction of an inaccurate application of law by the court below.
 
 II.
 
 17
 The second act of negligence by the government occurred when its agents incorrectly interpreted incoming information as a position report on the doomed flight. Because of this misclassification, an Alert was cancelled and precious hours were lost. The majority concludes that since Swoboda's life raft was later discovered near the point given in the position report, the information was correct and thus there was no negligence. The majority misinterprets the issue. Due to Swoboda's companions' mistake, the searchers initially scrutinized the wrong area although in hindsight it was the area in which Swoboda's raft was found. However, the harm-causing negligent conduct was the government's cancellation of the uncertainty phase based on a reported ELT, not a mistake with respect to Swoboda's location. Such a report is generally a basis for emergency action,[3] but through a series of incredible assumptions and misunderstandings this ELT transmission was classified as a position report and caused the cancellation of an uncertainty phase.
 
 
 18
 At 0052 GMT, an "uncertainty" phase was initiated by Anchorage. One of Swoboda's companions soon after reported: "We have just been talking to a MAC aircraft who has been hearing what we believe to be Swoboda's ELT. He turns it on every 15 minutes for a few seconds as his way of telling us he is OK. From talking to the MAC flight we estimate Swoboda to be approximately 49N 171W at 0040 and from that point he should pick up the beacon and navigate to Adak."[4]
 
 
 19
 The transmission relating this report demonstrates how it was misunderstood:
 
 
 20
 HNL: Yeah this is message from November six eight six eight reference three six seven four golf
 
 D12: Go ahead
 
 21
 HNL: Okay he advises ah that ah MAC aircraft apparently must have heard him talking to ah three seven six four golf and say the MAC aircraft advises that ah every fifteen minutes for a few seconds he was transmitting on ELT I don't know what he meant by that
 
 D12: Okay I know what it is
 
 22
 0059:40 HNL: Well the MAC aircraft advises basing on where he talked to him ah short while he was position forty nine north one seventy one west at zero zero four zero and ah basing from that position on he should be able to pick up beacon with ah (unintelligible) to Adak
 
 D12: Yeah he should
 HNL: (unintelligible)
 D12: Okay thank you very much
 
 23
 The Anchorage air controllers thereafter believed that a position report had been made by Swoboda:
 
 
 24
 When I came on duty, N3674G was overdue at the 40N position and had been put in an Incerfa phase. Some time later, Honolulu Center called with a position report on N3674G. They advised position as 49N171W at time 0040 GMT and advised that it had been received by a MAC aircraft who reported that he received it on an emergency locator transmitter. After receiving no position report after 49N171W the aircraft was again placed in Incerfa and Alerfa phases.
 
 
 25
 Narrative Statement of Carlton L. Schroeder, ATCS, Anchorage ARTC. Record at 575.
 
 
 26
 On assuming Floor Supervisor duties, I was briefed by the Supervisor I was relieving that the aircraft had radio problems. I checked with the sector to determine what steps were being taken to obtain a progress report on the aircraft. I was informed that another aircraft heard N3674G transmitting, but was unable to copy his position. When no further reports had been received one hour after N3674G was last heard, I initiated an Incerfa. This Incerfa was later cancelled when we obtained a report from a military aircraft that he had heard N3674G transmitting on his emergency locator transmitter and gave a position without an estimate. When a progress report had not been received an hour later I reissued an Incerfa. When N3674G did not show up at the Centers estimate at Adak and no further communications were received from N3674G I issued an Alerfa. I then informed the Assistant Chief on duty of the Alerfa and was relieved by him.
 
 
 27
 Narrative Statement of Willard G. Baker, SATCS, Anchorage ARTC Center. Record at 570. In short, then the Alert phase was cancelled based on nothing more than a report by a MAC flight that it had heard an ELT. Normally, such a report would provide an appropriate basis for emergency action. An order issued by the Federal Aviation Administration states in pertinent part:
 
 
 28
 a. When an ELT signal is received or reported, it shall be assumed that an emergency exists. FAA facilities shall immediately notify the appropriate rescue coordination center in accordance with procedures currently prescribed ...
 
 
 29
 Order No. 6050.29 of the Department of Transportation, Federal Aviation Administration (Nov. 19, 1973). Swoboda's companions assumed that the signal was from Swoboda, assumed that it meant he was OK, and assumed that he was heading in the right direction and would therefore pick up the direction beacon shortly. The government got this information, accepted all the assumptions involved, and added the misinformation that Swoboda himself had been heard from. It was hardly reasonable to rely on the string of assumptions that Swoboda's companions had made in face of regulations dictating action.[5]
 
 
 30
 Even under the majority's view that the FAA does not warrant the accuracy of the information it passes on, the government added error to information received and accepted a strained logic which concluded a pilot was safe based on the receipt of his emergency signal. This conduct is without question negligent.[6]
 
 III.
 
 31
 The final act of negligence on the part of the FAA occurred when no distress bulletin was issued when Swoboda's plane became overdue. The majority does not think this is negligence, because Swoboda's companions thought he had probably gone on to an alternate destination. Swoboda like all airmen had been assured by the FAA that if overdue, rescue would be initiated:
 
 
 32
 (5) Remember that if you fail to report within one-half hour after your ETA, a search will be started to locate you.
 
 
 33
 Airman's Information Manual 1-83, 1-84. This is pure substitution of judgment not an application of the clearly erroneous test. Even so, I would certainly agree with the trial judge that this conduct was negligent. The facts which the FAA had before it were: (1) a pilot was overdue, (2) the pilot personally made only one position report, ninety minutes into the flight, (3) the pilot had reported loss of one communication system and his failure to report likely indicated the loss of another, (4) the loss of some communications raised a specter of the loss of electric power entirely (without power Swoboda would have been robbed of the use of any navigational aids), and (5) although Swoboda had answered communications by using his ELT one beep for yes, two for no no such response had been heard for hours. The only thing heard from Swoboda had been a dramatic new pattern of transmission on his ELT for a few seconds every 15 minutes. In my opinion with these facts before it, it was not clearly erroneous for the trial court to find the government negligent.
 
 
 34
 I dissent.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 Radio communication on VHF or very high frequency is limited to a pilot's line-of-sight and is therefore only effective over relatively short distances. According to an expert witness for the Government, Swoboda would have been able to transmit on VHF approximately 80 or 90 miles. HF or high frequency permits a pilot to communicate at a much greater distance than on VHF. The expert testified that a plane can transmit 2000 or even 3000 miles on HF but cannot use HF to communicate short distances of a hundred miles or less
 
 
 [2]
 49 U.S.C.A. § 1421 requires all aircraft to be equipped with an Emergency Locator Transmitter (ELT). After an accident, the ELT emits a continuous audio tone which allows the location of the downed aircraft to be determined. Swoboda's plane contained both an ELT attached to the plane's tail and a portable ELT that could be manually operated. Although the matter is not entirely clear from the record, it was apparently impossible for Swoboda to transmit verbal communications with his ELT
 
 
 [3]
 The loss of transmission capabilities on Swoboda's radio apparently had no effect on his ability to transmit signals with his Emergency Locator Transmitter. Although the record is not entirely clear on this point, Swoboda's portable ELT appears to have been a self-contained unit, with transmission capabilities and a power source wholly apart from the aircraft's radio. Thus the total failure of Swoboda's radio did not deprive Swoboda of the ability to send signals with his portable ELT
 
 
 [4]
 The Search and Rescue Coordinator oversees rescue operations under the National Search and Rescue Plan (SAR). The SAR is an agreement between various government agencies and departments that seeks to effectively utilize all available federal facilities for search and rescue operations. The plan creates three regions inland, overseas and maritime and names a particular agency or military branch as the SAR coordinator for each region. The Coast Guard is the maritime region coordinator while the Air Force is the inland region coordinator. The plan permits the establishment of rescue coordination centers in the territorial subdivisions of each region. The rescue coordination center is responsible for coordinating and, where appropriate, directing the SAR facilities on a search and rescue operation. In re American Oil Co., 417 F.2d 164, 169-70 (5th Cir. 1969); United States v. Gavagan, 280 F.2d 319, 322 (5th Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961). During the initial stages, it appears from the record that search and rescue operations for Swoboda's plane were coordinated by the United States Navy at Naval Station Adak. However, the duties of coordinating the search were later transferred to the Coast Guard
 
 
 [5]
 An order issued by the Federal Aviation Administration states in pertinent part:
 a. When an ELT signal is received or reported, it shall be assumed that an emergency exists. FAA facilities shall immediately notify the appropriate rescue coordination center in accordance with procedures currently prescribed ...
 Order No. 6050.29 of the Department of Transportation, Federal Aviation Administration (Nov. 19, 1973).
 For a definition of rescue coordination center, see note 4, supra.
 
 
 [6]
 The En Route Air Traffic Control Manual states in pertinent part:
 When you (the air traffic controller) believe an emergency exists or is imminent, select and pursue a course of action which appears to be most appropriate under the circumstances and which most nearly conforms to the instructions in this manual. If you are in doubt that a given situation constitutes a potential emergency, handle it as though it were an emergency.
 Department of Transportation Publication # 7110.9D, § 907 (Jan. 1, 1975).
 
 
 [7]
 Plaintiff also argues that the FAA negligently delayed the search and rescue operation by canceling the first INCERFA or "uncertainty" bulletin in violation of the Good Samaritan Doctrine. Although having no duty to implement a search or rescue, the government can be liable under the Good Samaritan Doctrine if a search is negligently performed, the negligence results in a worsening of the condition of the person in distress and there is a reliance on the rescue operation. United States v. DeVane, 306 F.2d 182 (5th Cir. 1964). Plaintiff avers that the FAA commenced a search and rescue operation by issuing an INCERFA and can therefore be liable under the doctrine. The issuance of an INCERFA, however, does not amount to the commencement of a rescue. The Assistant Chief in Charge at Anchorage Center testified that the FAA had no control over initiating a physical search and simply supplied the appropriate rescue coordination center with information concerning the missing or overdue aircraft. Thus, the Good Samaritan Doctrine is inapplicable to the facts of this case. Even were the doctrine applicable, however, the government would not be liable since the plaintiff has failed to prove any negligence on the part of the FAA
 
 
 [8]
 The En Route Air Traffic Control Manual states in pertinent part:
 The National SAR Plan assigns search and rescue responsibilities as follows:
 a. To the military agencies conducting physical search and rescue operations.
 b. To the FAA:
 (1) Providing emergency service to aircraft in distress.
 (2) Assuring that SAR procedures will be initiated if an aircraft becomes overdue or unreported. This is accomplished through the ATC system for IFR aircraft and the flight plan and flight-following system for VFR aircraft.
 (3) Attempting to locate overdue or unreported aircraft by INREQ and ALNOT communications search.
 (4) Making all possible facilities available for use of the searching agencies.
 Department of Transportation Publication # 7110.9D, § 909 n.1 (Jan. 1, 1975).
 
 
 [9]
 The En Route Air Traffic Control Manual states in pertinent part:
 When an aircraft is considered to be overdue or in emergency status, alert the RCC and forward the following information, as available:
 a. Facility and person calling.
 b. Flight plan including color of aircraft if known.
 c. Time of last transmission received, by whom, and frequency used.
 d. Last position report and how determined.
 e. Action taken by reporting facility and proposed action.
 f. Number of persons on board.
 g. Fuel status.
 h. Facility working aircraft and frequency.
 i. Last known position, estimated present position, and maximum range of flight of the aircraft, based on remaining fuel and airspeed.
 j. Position of other aircraft near aircraft's route of flight, when requested.
 k. Whether or not an ELT signal has been heard or reported in the vicinity of the last known position.
 l. Other pertinent information.
 Department of Transportation Publication # 7110.9D, § 934 (Jan. 1, 1975).
 
 
 [10]
 The military aircraft reported the coordinates of Swoboda's strongest ELT signal to one of the companion planes. The companion plane relayed the information received from the military aircraft to FAA authorities at Anchorage Center. However, instead of informing Anchorage Center that the coordinates represented the location of Swoboda's ELT signal, the companion plane mistakenly stated that the coordinates represented the approximate position of Swoboda's plane. According to testimony in the record, Anchorage Center later replayed all of the information in its possession to the Search and Rescue Coordinator, including the incorrect coordinates of Swoboda's last known position that were received from the companion plane
 
 
 [1]
 See notes 5 and 6 of the majority's opinion
 
 
 [2]
 The majority sets forth the elements of negligence per se. Although it specifically does not find such negligence in this case, the majority would, I believe, be required on the evidence before us to affirm the district judge's finding of negligence per se
 
 
 [3]
 See notes 5 and 6 of the majority's opinion
 
 
 [4]
 The exact text of the message is:
 WE HV JUST BEEN TALKING TO A MAC ACFT WHO HAS BEEN HEARING WHAT WE BLV TO BE 74G ELT. HE TURNS IT ON EVERY 15 MINS FOR A FEW SECONDS AS HIS WAY OF TELLING US HE OK. FROM TALKING TO THE MACH ACFT WE EST 3674G TO BE APROX 49N 171W AT 0040 AND FROM THAT PX HE SHUD PICK UP THE BEACON AND NAV NML TO ADAK.
 HNL R
 
 
 [368]
 WILL CALL AGN IN 45 MINS
 Record at 538.
 
 
 [5]
 The Coast Guard recognized in its investigation that it was the erroneous interpretation of the information from the MAC flight as a position report which caused the problem
 In the interim Honolulu ARTCC passed N3674G to Anchorage ARTCC after receiving the missing aircraft's 222036Z (1036W) position report which indicated that the aircraft had entered the Anchorage ARTCC area. Anchorage ARTCC was never able to establish direct communications with N3674G, and relied instead on information furnished by N6868 and N7695C which indicated that the missing 74G was still airborne and not in trouble. At 230055Z (1455W) MAC 50237 relayed "flight operations normal" reports to Anchorage Center (ARTCC) for N7695C and N6868 and reported receiving ELT signals at regular intervals from 74G in the vicinity of 49N, 171W indicating that the missing aircraft was not in trouble. This report was misinterpreted by Anchorage Center as meaning that 74G was reporting his position as 49N, 171W when the MAC aircraft was actually reporting the position at which it had received the strongest signal. Anchorage Center had previously issued an "Uncertainty" (INCERFA) at 230052Z (1452W) which was subsequently cancelled after receiving and misinterpreting the MAC report. The uncertainty was reissued at 230137Z (1537W). An "Alert" (ALERFA) was issued at 230300Z (1700W) and a "Distress" (DETRESFA) finally declared at 230450Z (1850W).
 Record at 623 (emphasis supplied).
 
 
 [6]
 FAA regulations require that an emergency be assumed whenever there is any doubt. The Enroute Air Traffic Control Manual, No. 7110.9D, § 907, provides in part:
 When you believe an emergency exists or is imminent, select and pursue a course of action which appears to be most appropriate under the circumstances and which most nearly conforms to the instructions in this manual. If you are in doubt that a given situation constitutes a potential emergency, handle it as though it were an emergency.
 
 
 [907]
 Note. Because of the infinite variety of possible situations, specific procedures cannot always be prescribed for every situation which might be considered an emergency. As a rule of thumb, an emergency includes any situation which places an aircraft in danger; i. e., uncertainty, alert, being lost, or in distress
 The National Search and Rescue Manual, § 741, provides in part:
 The uncertainty phase is assigned anytime doubt exists as to the safety of a craft or person because of knowledge of possible difficulties, or because of lack of information concerning progress or position. The key word is doubt.