**David Nelson STANDEFER,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 73–1001.**

United States Court of Appeals,
Fifth Circuit.

April 14, 1975.
Rehearing Denied May 29, 1975.

Anthony J. P. Farris, U. S. Atty., William L. Bowers, Jr., Asst. U. S. Atty., Houston, Tex., for defendant-appellant.

Joseph D. Jamail, John Gano, Gus Kolius, Houston, Tex., for plaintiff-appellee.

Before TUTTLE, DYER and MORGAN, Circuit Judges.

DYER, Circuit Judge:

The United States appeals from an adverse judgment rendered under the Federal Tort Claims Act, 28 U.S.C.A. § 2671 et seq., based upon a Veterans Administration Hospital's negligent treatment of a patient, David Standefer, who was rendered quadriplegic. The Government raises a number of issues concerning both the imposition of liability and the award of damages. Although we determine that the judgment was proper as to liability, the inclusion of an inflationary factor in the computation of damages for future medical expenses and loss of earnings necessitates a partial reversal and a remand for recomputation of that portion of the award.

During the early morning of January 27, 1969, Standefer was injured in an automobile accident near Brenham, Texas, and was admitted to St. Jude's Hospital in Brenham. The attending physicians concluded that Standefer had a neurological problem beyond their expertise, and about noon the next day arranged to have the patient transferred to the VA Hospital in Houston. The senior neurological resident on duty at the VA facility, Dr. Patrick, was advised that Standefer was expected to arrive sometime during the afternoon, so the physician left orders with the admissions office that Standefer was to be brought to neurosurgery upon his arrival. Standefer arrived at the Houston hospital at approximately 4:30 p. m., but he was not sent to Dr. Patrick for examination until sometime between 7:00 and 7:30 p. m.

The physical examination conducted by Dr. Patrick indicated a neurological deficit, evidenced by a flaccid condition of the left leg, substantial weakness in the left arm, and some weakness on the right side of the body. There is some dispute whether Standefer was undergoing progressive paralysis from the time of the accident, but it appears that even during his wait in the admissions area of the VA hospital he was able to light and smoke cigarettes without assistance, drink water and carry on normal body functions. After the examination, Dr. Patrick was optimistic and indicated, according to one member of Standefer's family, that the patient would be up and around in a few weeks.

Although the attending physicians at St. Jude's in Brenham had suspected a subdural hematoma, a type of head injury, Dr. Patrick's examination led him to conclude that the injury was in the cervical spine. Upon being informed that x-rays had been taken at St. Jude's and that the films were in the family's possession, Dr. Patrick asked that the films be brought to him. The trip to obtain the films took considerably longer than Dr. Patrick anticipated, and he was further disappointed to discover that the x-rays contained no views of the cervical spine.

At approximately 10:30 p. m., Standefer was taken to the x-ray department. Because Standefer is a large man, standing over six feet tall and weighing over 200 pounds, the x-ray technician, Reeves, asked Standefer's son-in-law, Glasgow, to assist in the x-ray procedures. The first four films were taken with no difficulty, except that the x-rays were inadequate to reveal the exact location of the injury. It is undisputed that while the first four x-rays were being taken, Standefer was kept lying on his back, and that his head and neck remained virtually immobile. During the last two films, one arm was positioned above his body to obtain a view known as a "swimmer's lateral." According to Reeves and Dr. Patrick, Standefer was again so positioned for the fifth film, but both Standefer and Glasgow maintained that for the last film, Reeves pulled Standefer's right arm across his body, possibly in an attempt, according to expert testimony, to obtain an "oblique" view. Standefer felt a jerking motion "as though he was going to flip me over," and cried out that he was unable to move. Regardless of which version of the events actually occurred, the outcome was the same: Standefer left the x-ray room a permanent quadriplegic.

In November 1970, Standefer filed an administrative claim with the Veterans Administration. The incident giving rise to the claim was described by Standefer as follows: "Claimant sent to have x-rays taken. Veterans Administration Hospital employee twisted his neck and/or body causing onset of quadriplegia." After six months had passed with no final disposition of the claim,[1] Standefer filed this action alleging essentially the same basis for the lawsuit. In August 1972, approximately three weeks before trial, the complaint was amended to further charge negligence in admitting the patient to the VA hospital, in delaying the beginning of treatment, and for inadequately staffing the x-ray department. The district court, sitting without a jury,[2] accepted these contentions and determined that "[a]ll such acts of negligence, independently and in combination, on the part of the defendant, its agents and employees, proximately caused the paralysis suffered by the plaintiff." Based upon mortality tables showing that at the time of trial Standefer had a life expectancy of 20.0 years, the court awarded damages for: (1) loss of earnings, including an inflationary factor of 5.5%, in the amount of $130,439.09; (2) future medical expenses, based on a figure of $120 per day and including an inflationary factor of 4.5%, $929,238.20; (3) past medical expenses, $47,597.90; and (4) pain and suffering, $400,000.

The Government argues that no issue with respect to liability was properly before the court other than mistreatment *vel non* in the x-ray room, since Standefer's administrative claim before the Veterans Administration referred only to the occurrences in the x-ray department. Even if we were to accept this position, the judgment of the lower court could still be affirmed on the basis that liability was explicitly imposed on the VA for negligent acts "*independently* and in combination." In fact, by isolating the original basis of the claim, we need not address other issues such as negligent delay in admission and treatment, for we must affirm the decision of the court below if there is any theory on which liability can properly be predicated. As the Ninth Circuit held when presented with a similar situation: "In view of the fact that the judgment is based on two grounds . . . the judgment must be affirmed if supportable on either ground." Hayden v. Chalfant Press, Inc., 9 Cir. 1960, 281 F.2d 543, 547. By limiting our examination of the judgment to the original charge of negligence—which is essentially unchallenged in the appeal by the United States—it is unnecessary for us to consider the alternative theories of liability which the Government attacks.[3] Thus we now focus our inquiry on whether liability can be premised solely on the allegedly negligent treatment in the x-ray room.

In examining the legal basis of the judgment below we must determine whether a private individual would be liable under state law, in this case the law of Texas.[4] The requisites for establishing medical negligence were enunci-

1. 28 U.S.C.A. § 2675(a).

2. 28 U.S.C.A. § 2402.

3. For our disposition of the Government's contention that the United States cannot be held liable for the manner in which it staffs a VA hospital *see* note 5, *infra.* As for the other acts of alleged negligence on which the district court relied, it is sufficient to say that: "In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." Helvering v. Gowran, 1937, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224.

In our determination of this appeal, we need not and do not reach the merits of the Government's arguments that Standefer failed either to make a prima facie case or to introduce sufficient evidence to support the alleged acts of negligence by the VA prior to the incident in the x-ray room. Even if the VA was negligent in failing to render prompt treatment to Standefer, the determination that the x-ray room mishandling proximately caused the onset of quadriplegia renders the earlier negligence irrelevant.

4. 28 U.S.C.A. § 2674. United States v. Muniz, 1963, 374 U.S. 150, 153, 83 S.Ct. 1850, 10 L.Ed.2d 805.

ated by the Supreme Court of Texas as follows:

> It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries.

Bowles v. Bourdon, 1949, 148 Tex. 1, 219 S.W.2d 779, 782. While this action is not against Dr. Patrick personally, the underlying theory of the lawsuit is that once the neurosurgeon was aware of the probability of injury to the cervical spine, he was under a duty either to warn the x-ray technician of the need for special precautions or to be present during the x-ray procedures to make certain that the patient's head and neck were carefully handled. After reviewing the expert evidence adduced by Standefer, we are satisfied that Dr. Patrick was on notice of the need to safeguard Standefer from any twisting or turning which might aggravate the injury. The plaintiff's expert witness further established that an attempt to pull Standefer's arm across his body to obtain an oblique view could have resulted in the jerking motion that Standefer recalled. If the x-ray technician did so position the patient, and if neither he nor the neurosurgeon had taken the required steps to immobilize the patient's neck before the maneuver was attempted, the result could have been a "new insult" which proximately caused the sudden onset of quadriplegia.[5] We conclude that Standefer carried the legal burden established by Texas law. Although the Government, too, presented expert evidence in support of its theory that Standefer was undergoing a progressive paralysis which suddenly culminated in quadriplegia during a properly conducted x-ray procedure, our task is not to choose between conflicting theories, but to make certain that the theory accepted by the district court has sufficient evidentiary support.

As we view this case, the outcome depends entirely on the district court's factual resolution of what occurred in the x-ray room. Because the version of the events related by Standefer and Glasgow was totally opposed to the version given by the x-ray technician and the physician, the applicable standard is whether the district court was clearly erroneous in accepting the plaintiff's factual assertions. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20.

■■ At this juncture, it is appropriate to address another point of alleged error raised by the Government since it is inextricably connected with the soundness of the district court's findings of fact. The United States asserts that the court below abused its discretion in the conduct of the trial by summoning its own witnesses, launching collateral inquiries and otherwise departing from its judicial role by becoming an advocate for the plaintiff. Since the action was tried without a jury, the district court is accorded great discretion in its role in the trial. Bowles v. Lentin, 7 Cir. 1945, 151 F.2d 615, 620, relied on by the Government to buttress its position, suggests

---

**5.** The Government's contention that the district court erred in holding that a proximate cause of Standefer's injury was inadequate staffing of the x-ray department gives us little pause. The argument that staffing is a discretionary function for which the United States cannot be held responsible under the Federal Tort Claims Act presents a legal issue that is undercut by the facts of this case. The expert witnesses for both sides agreed that because of Standefer's size, a single x-ray technician would require additional help. However, it was made clear that any "semi-intelligent layman" could, *with proper direction,* provide the needed assistance. As noted before, Standefer's son-in-law was asked to aid in positioning the patient, but the record leaves no doubt that Glasgow was called upon only to hold Standefer in the position in which the x-ray technician placed him, hence the question remains whether the x-ray technician and the neurosurgeon took the necessary steps to protect Standefer's head and neck.

only that it is "conceivable" that the conduct of a judge might be so unfair as to evidence prejudice warranting reversal. Even this less than compelling language is prefaced by the observation that in the absence of a jury, a court has "wide latitude" in commenting upon the occurrences at trial, and by the caveat that appellate courts must guard against magnification of instances which are of little importance in their setting. In this case, the Government complains primarily of the in-court investigation into what appeared to be an attempt to tamper with hospital records pertaining to the VA's treatment of Standefer. Because there was so little non-testimonial evidence of what actually happened in the x-ray room, we certainly cannot fault the district court for trying to ascertain the reliability of records which might lend credence to one of the versions being urged by the litigants. While the record does show that the court actively participated in the trial, we are unpersuaded that its expressions indicate prejudice requiring reversal.

Finding no basis for the contention that the court exceeded the bounds of judicial propriety in its conduct of the trial, our review is limited to determining whether the court's factual resolution of the controversy fails to meet the clearly erroneous standard. Where, as here, the outcome depends so greatly on the evaluation of highly conflicting evidence, we must give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." Rule 52, Fed.R.Civ.P. We are satisfied that the district court was not clearly erroneous in the resolution of the disputed facts. United States v. Yellow Cab Co., 1949, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150. We affirm the district court's imposition of liability on the United States.

■ Turning now to the damages awarded Standefer, we address the three specifications of error argued by the Government. The first contention is that the district court erred by using mortality tables with no adjustment to take account of the impact of Standefer's disability on his life-span. The Government's expert evidence was to the effect that quadriplegia might decrease Standefer's life expectancy by ten to fifteen percent. Although no challenge could be made to the admissibility of mortality tables in this case, Kershaw v. Sterling Drug, Inc., 5 Cir. 1969, 415 F.2d 1009, 1012, the Government argues that reliance by the district court on unadjusted mortality tables was contrary to the weight of the evidence. Tabor v. Miller, 3 Cir. 1968, 389 F.2d 645, cert. denied 391 U.S. 915, 88 S.Ct. 1810, 20 L.Ed.2d 654. In *Tabor*, life expectancy tables were excluded but the court concluded that even without them, the jury had adequate evidence to resolve the "necessarily speculative question" of the plaintiff's probable life-span. *Id.* at 647. In the case *sub judice*, a judge, not a jury, was called upon to answer this "necessarily speculative question," and while there was evidence that Standefer's life-span might be diminished by being a quadriplegic, the court also had other factors to consider. For example, the parties seemed to agree that the figure of $120 per day for medical care was a reasonable approximation of costs which would have to be borne over a number of years, subject, however, to the contingency that if Standefer encountered any serious medical complications, the estimate might be too conservative. Balancing such factors is within the province of the district court, and we are unwilling to hold that the court abused its discretion in computing damages based on standard mortality tables considered in conjunction with the other variables existent in this case.

■ The Government's second attack on the damages awarded is directed at the amount found due for past medical expenses incurred at the VA facility prior to the time of trial. We find no basis for overturning the decision of the district court that unless the Government agreed to waive its lien pursuant to the Medical Care Recovery Act, 42 U.S.C.A. § 2651 et seq., Standefer was entitled to recover an amount equal to his past

medical expenses from the United States in this action.

█ Finally, we reach the contention of the Government that the district court erred in allowing an inflationary factor to be used in computing damages for future medical expenses and for the loss of future earnings. Our en banc decision in Johnson v. Penrod Drilling Co., 5 Cir. 1974, 510 F.2d 234 [Nos. 71–2243, 71–2245, March 21, 1974, p. 4581] establishes the correctness of the position taken by the United States, and thus necessitates a reversal of the judgment on these items. The district court did not have the benefit of our final holding in *Penrod* at the time of trial, hence we remand this case to the court below for a recomputation of damages for future medical expenses and loss of earnings.

Finding no other meritorious points in the appeal, we affirm the judgment in all other respects.

Affirmed in part, reversed in part, and remanded.