Benjamin T. GRACI, Jr., etc.

v.

UNITED STATES of America.

Philip C. CIACCIO, etc.

v.

UNITED STATES of America.

Emanuel REID, Jr., etc.

v.

UNITED STATES of America.

Audra GALJOUR, wife of/and Elmer Tapper, etc., et al.

v.

UNITED STATES of America.

Mrs. Andrew C. APPEL, Jr., et al.

v.

UNITED STATES of America.

Civ. A. Nos. 15962, 15976, 16091, 66–306 and 67–1280.

United States District Court, E. D. Louisiana.

July 22, 1977.

Jerald N. Andry, Gilbert V. Andry, III, Andry & Andry, Gibson Tucker, Jr., Tucker, Schonekas & Garrison, New Orleans, La., for plaintiff in CA 15962.

Joseph J. Laura, Jr., Ignatz G. Kiefer, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiff in CA 15976.

Charles G. Jacques, Jr., Benjamin J. Birdsall, Jr., James F. Mulla, Jr., New Orleans, La., for plaintiff in CA 16091.

Elmer R. Tapper, Tapper & Schuler, Chalmette, La., Evangeline Molero Vavrick, New Orleans, La., for plaintiffs in CA 66–306 and 67–1280.

Gerald J. Gallinghouse, U. S. Atty., James D. Carriere, John R. Schupp, Don M. Richard, Robert L. Boese, Asst. U. S. Attys., New Orleans, La., for defendant and third party plaintiff.

Charles M. Lanier, Phelps, Dunbar, Marks, Claverie & Sims, Richard J. McGinity, Jr., New Orleans, La., for third party defendant Board of Commissioners of the Port of New Orleans.

## MEMORANDUM OPINION

HEEBE, Chief Judge:

This case presents consolidated individual actions emanating from the flooding that occurred in certain portions of Orleans and St. Bernard Parishes attendant upon the striking of the Louisiana coast by Hurricane Betsy on September 9 and 10, 1965.

The plaintiffs in these proceedings allege negligence on the part of the United States of America in design, construction and operation of the Mississippi River Gulf Outlet. The United States has filed a third party complaint against the Board of Commissioners of the Port of New Orleans based upon an indemnity agreement whereby the Board of Commissioners agreed that it would hold and save the United States free from all claims and damages due to construction, maintenance and operation of the Mississippi River Gulf Outlet.

Based upon the evidence presented at the trial of this matter, the Court makes the following Findings of Fact and Conclusions of Law in support of its decision denying liability of the United States and of the Board of Commissioners of the Port of New Orleans for the damages arising out of Hurricane Betsy alleged by plaintiffs.

## I. FINDINGS OF FACT

*Topography*

1. The Chalmette area, in which plaintiffs' property damage occurred, is bordered on the south and southwest by the Mississippi River, on the west by the Inner Harbor Navigation Canal (IHNC), on the north by the Gulf Intercoastal Waterway (GIWW), on the northeast by Lake Borgne, and on the southeast by open marsh leading to the Gulf of Mexico.

2. Between Lake Borgne and the Chalmette area are approximately seven miles of marshland intersected on the Lake Borgne side by the Mississippi River Gulf Outlet (MRGO).

3. Elevations in the marsh are generally at or below mean sea level (msl), never rising above +2 feet above msl. Elevations in the remaining Chalmette area range from 0 to +4 feet above msl. The marsh area, excepting the MRGO spoil bank, is completely inundated with tides of +2.6 feet or greater.

4. At the time of Hurricane Betsy (9–10 September 1965), the residential area of Chalmette was enclosed by a levee at the 40 arpent line (i. e., approximately 1.45 miles

from the Mississippi River). This levee, the Chalmette Back Levee, was a non-federal project maintained by the Chalmette Back Levee District. Testimony of Mr. Earl Magner, of the Louisiana Department of Public Works (DPW) and the official DPW levee height measurements before Hurricane Betsy indicated the levee height at Cougar Drive to be +7.8 feet above msl. Other measurements indicated: 100′ north of Cougar Drive = +7.8; 200′ north = +8; 300′ north = +8; 400′ north = +8.4; 100′ south of Cougar Drive = +7.4; 200′ south = +8.0; 300′ south = +8.3; 400′ south = +8.2.

5. There existed no natural barriers to water flow into the marsh area between the Chalmette Back Levee and Lake Borgne (to the northeast) or the Gulf of Mexico (to the south). Cypress stumps, oyster grass and three-cornered grass comprise the vegetation in the marsh area with no appreciable change in density prior to or following MRGO construction as reflected in the testimony of Mr. Victor Molero.

6. One man-made barrier existed in the marsh area in the form of a spoil area bordering the western side of the MRGO. This spoil area consisted of natural dredged materials and had a minimum height of +6 feet above msl. The spoil area was approximately 4000′ in width and extended the entire length of the MRGO (with the exception of occasional interruption by natural tributaries). Sample core drillings for levee height examination by the Corps of Engineers (entered into evidence by the defendants) indicated that even subsequent to Hurricane Betsy the minimum height for any section of this spoil area was +6.

7. The MRGO is bordered on the northeast for approximately 16 miles by Lake Borgne which has a surface area of approximately 350 + square miles but a relatively shallow depth of 3 feet to 25 feet maximum. Lake Borgne is fed directly from the Gulf of Mexico via the Mississippi Sound (through a six mile wide water course).

8. Prior to the MRGO construction the marsh area between Lake Borgne and the Chalmette Back Levee was interlaced and

interconnected by hundreds of tributaries of varying size, the largest being Bayous Bienvenue and Dupre. Flow through these tributaries was unimpeded. Following MRGO construction the majority of these tributaries were closed by the MRGO spoil area excepting Bayous Bienvenue and Dupre which remained unimpeded. Testimony of all witnesses familiar with the area indicated that these tributaries rose and fell with the normal astronomical tides and in so doing, the entirety of the marshland (with the exception of the MRGO spoil area) was regularly flooded during periods of high tides both prior to and following construction of the MRGO.

9. Immediately adjacent and on the south and southwest sides of the Chalmette Back Levee was a drainage canal. This canal was approximately −11 below msl and was drained by two pumping stations.

10. From the IHNC to the Orleans-St. Bernard Parish Line the Southern R. R. embankment operated as a continuance of the Chalmette Back Levee. The embankment was not federally maintained. The drainage canal continued along the embankment to the IHNC. Approximately 250′ south of the IHNC on the embankment was located the Florida Avenue pumping station.

11. Testimony of Mr. Magner and DPW records indicated that the height of the embankment averaged +9 feet above msl.

12. The waters of the IHNC enjoyed free exchange with Lake Pontchartrain through the passage at Seabrook, and with the GIWW at their intersection.

13. The waters of the MRGO enjoyed free exchange with Lake Borgne through the hundreds of tributaries connecting the two.

14. The waters of the GIWW enjoyed free exchange with the Mississippi Sound and the IHNC and were joined by the MRGO southeast of Paris Road.

*The Mississippi River Gulf Outlet (MRGO)*

15. The MRGO is a navigable waterway constructed under the authority of Public Law 455, 84th Congress, 2nd Session, approved March 29, 1956, substantially in accordance with the recommendation of the Chief of Engineers as contained in House Document 245, 82nd Congress, 1st Session, at an estimated cost of $88,000,000. 70 Stat. 65.

16. The MRGO is a deep water channel constructed by the Corps of Engineers in the later 1950's and early 1960's at an estimated cost of $88,000,000. The channel is approximately 66 miles long, including 46 miles of "land cut" and runs from the Gulf of Mexico through the parishes of St. Bernard and Plaquemines to New Orleans. The outlet enables ships from ports east of the Mississippi River to head north for New Orleans at Breton Sound, many miles east of the river mouth, at a saving of sixty miles.

17. The MRGO is a channel 38 feet deep by 500 feet wide which begins in Breton Sound and continues generally northwesterly through the parishes of St. Bernard and Orleans to its juncture with the Inner Harbor Navigation Canal, generally referred to as the Industrial Canal.

18. The Board of Commissioners for the Port of New Orleans furnished free of cost to the United States all lands, easements, rights of way and spill disposal areas for the construction for the MRGO, which the U. S. Corps of Engineers was to construct, maintain and operate.

19. The MRGO was constructed by the U. S. Corps of Engineers as an aid to navigation (distinguished from a flood control project) pursuant to legislative mandate of the U. S. Congress.

20. The MRGO, in that area where it traverses land, has on its southwesterly side a spoil bank approximately six feet high to a point near the intersection of the MRGO and Bayou Bienvenue.

21. Under normal weather conditions, the MRGO is responsible for a minimum of 88% of the flow of tide water reaching the area at its upper end, the balance being conveyed by the Intercoastal Waterway and other bayous and canals.

22. The MRGO is subject to tidal flows and reverses the direction of flow daily in response to the normal lunar tides in Breton Sound, the reversal proceeding throughout the length of the MRGO.

23. Since the construction of the MRGO increased amounts of salt water have flowed into the upper reaches of the area involved in this litigation, increasing the salinity of the marsh as well as Lake Pontchartrain and Lake Borgne.

*Hurricane Betsy*

24. Hurricane Betsy struck the Louisiana coastline at approximately 10:00 p. m., September 9, 1965, passing west of New Orleans in a generally northwesterly direction.

25. The hurricane was accompanied by winds exceeding 120 miles per hour with gusts to 160 miles per hour, traveled at a speed of 20 miles per hour, was accompanied by a central pressure of 27.82 inches, and was generally considered to be a large hurricane in size and intensity.

26. Hurricane Betsy was the most destructive storm of record on the Louisiana coast resulting in damages and expenditures related to the hurricane of $2 billion, 2½ million acres of land flooded, 300,000 persons evacuated, and 27,000 homes destroyed or flooded.

27. Hurricane Betsy, while unusually ferocious, was not the only hurricane to produce flooding in the areas occupied by plaintiffs' property. Since 1900, 88 hurricanes and tropical storms have traversed through or by the Louisiana coast. Three of these, in 1915, 1947, and 1956, prior to the construction of the MRGO, produced flooding similar to that experienced in Hurricane Betsy. Government's Exhibit No. 18 illustrates the areas inundated by these hurricanes. Within the inundated areas are those occupied by plaintiffs' properties.

28. While the damage caused by Hurricane Betsy was far more severe than that occasioned during prior hurricanes, the severity and track of Hurricane Betsy are responsible therefor as opposed to any man-made construction such as the MRGO. Betsy was so severe that all the Louisiana coastal lowlands experienced some inundation and following Betsy's occurrence the scientific parameters for calculating hurricane protection were, of necessity, recomputed. See testimony of Professor Chester Peyronnin.

29. The track of Hurricane Betsy, from southeast to northwest, placed the New Orleans and Chalmette areas into the northeast quadrant of the storm resulting in winds driven toward these areas proceeding first from the north, then northeast, east, and finally southeast. It is in the northeast quadrant where the highest winds and greatest surge are occasioned.

30. Lake Pontchartrain, under the effects of northerly winds was the first water body to influence the water levels in the Industrial Canal via Seabrook and provided early high water levels at the south end of the Canal.

31. Lake Borgne, under the stress of northeasterly winds, was next affected and provided additional flooding into the Industrial Canal. This is borne out through the fact that the salinity at Seabrook was the same as Lake Borgne and not Breton Sound, indicative of Borgne as the origin of the waters. Salinity levels of the waters in Chalmette were similarly indicative of Borgne as the water's origin.

32. As Hurricane Betsy entered the Gulf of Mexico on its track from the Florida Straight the entire coastal area of the Gulf was affected by the hurricane's mere presence resulting in a tidal rise along the coasts of approximately two feet generated by the light winds (15 to 25 mph) around the periphery of the hurricane.

33. As Hurricane Betsy approached the Louisiana coast, there was associated with the hurricane a drop in barometric pressure. This drop in pressure lessened the normal compression of surface waters creating an abnormally high tide. For Betsy the barometric pressure dropped from the normal 29.92 inches of mercury to 27.82 inches. This pressure difference caused a tidal rise of approximately 2.39 feet at the hurri-

cane's eye. Thus the greatest total tidal rise experienced during Betsy caused by the combination of peripheral winds and drop in barometric pressure was 4.39 feet. Total rise in the Borgne-Chalmette area was approximately 4.30 feet.

34. Following this tidal rise, the marshlands between the Chalmette Back Levee and the large water bodies of Lake Borgne and Breton Sound had two to four feet of standing water with direct flow from Lake Borgne and the Gulf of Mexico by early evening September 9th. Only the MRGO spoil bank was not inundated by the tidal rise.

35. As Hurricane Betsy continued toward New Orleans, a slow rising storm surge was superimposed on the abnormally high tide, capped by wind-driven waves from the northeast quadrant driven toward the southwest.

36. A storm surge, rather than being a wall of water, is a dome-like water increase, centered under the eye of the storm, which diminishes gradually in all directions from the center. Its fore-runners are the tidal rises preceding the hurricane's advance and the water height gradually increases as the highest winds and lowest barometric pressures approach a land mass.

37. The nature, strength, duration, height, and wave heights of a surge are dependent on the wind direction and intensity, and on the forward speed of the storm. Hurricane Betsy was a slow-moving storm resulting in a gradual rise of 6 feet in 10 hours. During the early phases of the storm, wind direction raised the waters in Lake Borgne and southerly winds after the eye of the storm had passed maintained these high levels.

38. Due to the natural influences of northerly winds, water levels in Lake Borgne rose earlier than in Breton Sound. Prior to approximately 8:00 p. m. on 8 September 1965, the flow in the MRGO and adjacent low marsh was seawards, from Lake Borgne to Breton Sound. From approximately 8:00 p. m. until midnight, water levels in Breton Sound were higher than in Lake Borgne. The difference in levels would cause a flow from Breton Sound to Lake Borgne of 2–3 feet per second (about 2 mph). By 4:00 a. m. the flow reversed again to flow seaward. Thus in the four hours the waters flowed from Breton Sound toward Lake Borgne, the waters would only travel 8 of the 35 miles to Lake Borgne. These waters did not reach the vicinity of Chalmette. After midnight on 9 September, Lake Borgne levels exceeded those in Breton Sound so that flow in the MRGO was thereafter seawards.

39. Hurricane driven waters during Betsy from Breton Sound were directed to the southwest overtopping the levees at Point a la Hache. Hurricane driven waters during Betsy from Lake Borgne were directed to Chalmette on the southwest and reached a height of 5.1 feet in the marsh between Lake Borgne and the Chalmette Back Levee by 9:15 p. m. September 9th as reflected in the testimony of Mr. Gutierrez, supervisor of a pumping station on the Chalmette Back Levee.

40. From approximately 10:30 p. m., September 9th to approximately 5:30 a. m. September 10th, the Chalmette Back Levee was subjected to water levels in excess of 9 feet driven towards the levee from Lake Borgne. As testified by Mr. Gutierrez, by 10:30 p. m. all levees in his view were being overtopped, the marsh was like a large lake, and the wind was from the northeast, perpendicular to the MRGO.

41. Until about midnight of September 9th, waves of 1.8 to 2.3 feet in height, coming from the north-northeast, were also attacking the levee. Mr. Gutierrez testified that waves would break "over" him as he ran along the levee.

42. Both the high waters and the waves were driven from Lake Borgne across the MRGO in a perpendicular direction, rather than up the MRGO in the direction of New Orleans. Instead of accelerating the flooding in the area, early in the storm the spoil area of the MRGO acted as a barrier to water flow. Later on the depth of the MRGO inhibited wave propagation and induced recession of the flood waters.

43. For a minimum of 7½ hours the storm-driven waters flowed over the Chalmette Back Levee at Cougar Drive where the levee height was only 7.8 feet. As explained by Mr. Soileau, the water and wave action weakened the levee through overtopping and undercutting and in the early morning hours of September 10th the levee failed, eventually resulting in a gap of 200 + feet. Following the collapse of this non-federal levee, flooding of plaintiffs' property ensued but was delayed several hours due to the presence of canals, ditches and low areas required to be filled prior to the flooding.

44. The presence of the MRGO in the marsh area, due to sub-surface water movement from Lake Borgne to Breton Sound, served to relieve the flooded marsh. No hurricane waters from Breton Sound existed in the MRGO after midnight September 9th and those preceding fell 20 miles short of reaching the Chalmette area.

45. Levee failures in the Industrial Canal area were caused by overtopping of the levees from storm-driven waters originating in Lake Borgne and carried to the Industrial Canal over the open marsh and through the Gulf Intercoastal Waterway. These failures did not contribute to the flooding of plaintiffs' property.

46. The hurricane surge experienced during Betsy influenced an area in excess of 150 miles along the Gulf Coast. Of this distance, 120 miles experienced a surge in excess of + 8 feet, from Grand Isle to Biloxi, Mississippi. Government Exhibits No. 4 and No. 18 indicate the enormity of the coastal area inundated during Betsy.

47. The MRGO has a width of 500 feet. Within 120 miles of coastline receiving a surge of + 8 feet or greater during Hurricane Betsy, the MRGO represents approximately .000789%, or less than one one-thousandth of the affected area.

48. The MRGO did not in any manner, degree, or way induce, cause, or occasion flooding in the Chalmette area. All flooding was the result of natural causes working upon local waters which have before threatened and caused flooding in the area

due to the inadequate non-federal local protective features.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties, and under 28 U.S.C. Section 1346 and 28 U.S.C. Section 2671, et seq., (Federal Tort Claims Act) has subject matter jurisdiction over this suit by plaintiffs against the United States for damages allegedly received as a result of defendant's construction of the MRGO.

2. In a suit brought under the Federal Tort Claims Act, the United States is amenable to damages in the same manner and to the same extent as a private individual in like circumstances. 28 U.S.C. Section 2674.

3. In determining the liability of the United States to be cast in judgment for damages, the substantive laws of Louisiana (the state in which the incident occurred) are controlling. *Standefer v. United States,* 511 F.2d 101 (5th Cir. 1975); *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

4. Under Louisiana law, every act of the United States that causes damage to another as a result of the fault of the United States obliges the United States to repair that damage. LSA C.C. Art. 2315.

5. The elements of a cause of action under Article 2315 are Fault (which embraces all conduct falling below a proper standard), Causation, and Damage. *Weiland v. King,* 281 So.2d 688, 690 (La.1973).

6. Under Louisiana law, the United States is responsible for the damage it occasions not only by its acts, but also by its negligence, imprudence and want of skill. LSA C.C. Art. 2316.

7. The United States as grantee of the right of way, builder and maintainer of the MRGO assumed a high standard of care with relations to damages caused by the works to neighboring lands and individuals. LSA C.C. Art. 667; *Carr v. City of Baton Rouge,* 314 So.2d 527 (La.App.1975).

8. The failure to exercise that degree of care ordinarily expected of a reasonably prudent person under similar circumstances constitutes negligence. *Fire & Gas Ins. Co. of Conn. v. Garick,* La.App., 312 So.2d 103, *writs denied,* 313 So.2d 845 (La. 1975).

9. The Congress of the United States authorized the design and construction of the deep water channel known as the MRGO. Public Law 455, 84th Congress, approved March 29, 1956.

10. The MRGO was built as an aid to navigation, not as or in connection with a flood control project; and Congressional directives provided no authorization for construction of flood control works in coordination with construction of the MRGO. *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971).

11. Plaintiffs have evidenced no variance between the project as completed and the construction of the project as directed by Congress.

12. Plaintiffs have failed to show by a preponderance of the evidence any fault by the defendant in the design, construction or functioning of the MRGO.

13. Nor have plaintiffs shown by a preponderance of the evidence any negligence by the defendant in the design, construction or functioning of said project.

14. Nor have plaintiffs shown by a preponderance of the evidence any causal connection between the MRGO and any damages which plaintiffs may have sustained.

15. Inasmuch as this Court finds no liability by the defendant, United States, there is also no liability of the third-party defendant, the Board of Commissioners of the Port of New Orleans, on its agreement to indemnify the United States.