Joseph S. CHERNOCK, Charles Young, and Conor P. Sheehey, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 87–50009–RV.

United States District Court, N.D. Florida, Panama City Division.

June 14, 1989.

**901**

Lynn C. Higby, Bryant, Higby & Williams, Panama City, Fla., for plaintiffs.

K.M. Moore, U.S. Atty. N.D. Fla., Pensacola, Fla., and Leon B. Taranto, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

### ORDER AND MEMORANDUM OPINION

VINSON, District Judge.

The plaintiffs filed this suit under the Federal Tort Claims Act, claiming damages as a result of exposure to radiofrequency radiation at Tyndall Air Force Base in Bay County, Florida. The cause was tried before the Court without a jury on February 6–7, 1989, in Panama City, Florida. After hearing all the evidence, I ruled from the bench for the defendant. In accordance with Rule 52(a), Federal Rules of Civil Procedure, I make the following findings of fact and conclusions of law.

### I. *Findings of Fact*

The three plaintiffs Joseph S. Chernock, III (Chernock), Charles Young (Young), and Conor P. Sheehey (Sheehey), with Chris Ullem (Ullem) arrived at Tyndall Air Force Base on the morning of Saturday, December 21, 1985, to repair the catwalk encircling Building 1281, also known as the Radome. A contract for maintenance on the Radome had been awarded to John McLemore of Beaches Remodeling in Panama City, Florida. He contacted Chernock who was then doing business as Ace Products, an aluminum fabricator, with respect to providing labor and materials. The Radome contract required the wooden railing on the Radome catwalk be replaced with an aluminum railing. Chernock arranged for Young, Sheehey, and Ullem to help him perform the subcontract, and the four men arrived at Tyndall with McLemore between 8:00 and 9:30 a.m. on December 21 to begin work.

Building 1281 is a joint use site for the Federal Aviation Administration (FAA) and the United States Air Force. It houses the Air Route Surveillance Radar (search radar) and a beacon transponder system, both used by the FAA for air traffic control. About 400 feet away from Building 1281 is Building 1283, the site of the Height Finder Radar. All three radar systems transmit radio-frequency (RF), or microwave, radiation.

The Radome contract required the work to be performed on weekends, when the search radar could be shut down and its functions assumed at another FAA site. The shut-down scheduled for December 21 was delayed, and at the time of their arrival, the crew was told that they could not begin work for about two hours.

McLemore, Ullem, and the three plaintiffs went to a breakfast restaurant and returned about an hour and a half later. Soon after their second arrival, the crew was allowed to begin work. The temperature on December 21, 1985, was cold; as the work was to be performed outside, the men had all worn several layers of clothing. The work of removing the wooden railing required the men to lay on their stomachs to remove the rail attachments at the base of the catwalk. The catwalk itself consisted of an open grill with a rough nap about 30 feet above the ground.

After the men had worked on the catwalk for about four hours, they communicated to each other that they were all suffering from nausea and dizziness. They decided to stop working for the day at

about 2:30, and return the following morning. They informed the Radome personnel, secured their equipment, and left.

The four lived fairly close together. Young lived in the same house as Chernock; Sheehey lived next door; and, Ullem lived two blocks away. After showering and changing clothes, they met at Chernock's house.

Each man remarked to the others that he had noticed reddened skin on his chest. Chernock suggested that they go to Bay Medical Center for an examination. At the emergency room, the men were examined separately, but each man told the attending medical personnel of his work activities that day. Only Young's medical examination reports "florid chest skin." Chernock, Young, and Sheehey were all diagnosed as having suffered microwave radiation injuries.

Following the visit to the emergency room, the men were examined by Dr. Thomas Merrill. He saw the plaintiffs first about a week after the incident. At that time, no skin redness was present. He testified that redness and nausea were consistent with exposure to microwave radiation. Merrill prescribed Xantac for the plaintiffs' nausea.

According to Dr. Merrill, Sheehey and Young were not suffering from any permanent physical effects of the alleged exposure at the time of trial. Chernock was still experiencing hyperacidity, which Merrill believed was related to the exposure. However, Merrill testified that the damaging effects of exposure would most likely appear in the future rather than at present, and, therefore, future monitoring was necessary.

Michael Chandler, an electronics technician, was working at the Radome on December 21, 1985. According to Chandler, the search radar was scheduled to be shutdown that morning as soon as the work crew arrived. After the arrival of McLemore, Ullem, and the plaintiffs, Chandler requested permission of the FAA to shutdown the radar. He was denied downtime for a period of about two hours, which he communicated to the men. When the crew

returned later in the morning, the downtime was approved. The search radar log indicates that it was shut down at 1755 Greenwich Mean Time, or 11:55 a.m. local time, on December 21. The beacon transponder was not shut down at all while the men were working. The search radar was returned to operation at 2140 GMT, or 3:40 p.m. local time.

Carl Johnson of the FAA testified about the operation of the search finder radar. He stated that it could not be turned on by accident, that it required 20 minutes warmup, and that there were audible alarms for unplanned startups.

Johnson and Robert Fent explained the operation of the height finder radar on December 21, 1985. During the time the crew was working, the height finder was manually oriented to radiate at 180 degrees in azimuth toward the south in a direction away from Building 1281. The radar blanker also had been turned on so that its power would shut off if it did rotate into the direction of the Radome; the blanker prevents the height finder from rotating into the arc which includes the Radome. The blanker was turned on at 1755 GMT (11:55 a.m.) and turned off at 2205 GMT (4:05 p.m.).

Sergeant Fairly was in charge of the height finder in Building 1283 on December 21. He was notified by Fent that the crew was working on Building 1281. He noted during the afternoon check that the search radar was off, but the beacon was on. He personally took manual control of the antenna and turned it into a 180 degrees south azimuth at 9:00 a.m.

The alleged overexposure was reported the next day to the Air Force. On December 26, 1985, Lt. William K. Shelton, Chief of Bioenvironmental Engineering Services at Tyndall, took RF radiation measurements on the catwalk of the Radome. Using a Narda Broadband Isotropic Radiation Meter (Model 8611), Lt. Shelton took measurements around the entire circumference of the Radome. He measured no significant radiation with the beacon transponder emitting and the search radar turned off. With both sources transmitting, he took a

measurement of 0.02 mW/cm2 (milliwatts per square centimeters). Under Air Force standards, the permissible exposure limit for RF radiation produced by the search radar is 10 mW/cm2.

Dr. Eleanor Reed Adair, director of the microwave laboratory at the John B. Pierce Foundation in New Haven, Connecticut, testified on behalf of the defendant about the effects of RF radiation. She explained that there are two types of radiation: radiofrequency, or microwave, radiation, and electromagnetic radiation. The former appears at extremely low frequency ranges with very long wave lengths; the latter in the higher frequency range with shorter wave lengths.

At higher frequencies, there is greater energy. An electromagnetic beam has greater energy than the binding energy in electrons; thus, it causes the ions in matter, including flesh, to separate. This causes tissue damage in animals. Exposure to such "ionizing" radiation always produces an effect.

RF, or microwave, radiation, on the other hand, is "non-ionizing," that is, RF beams do not produce sufficient energy to cause ion separation. Exposure to non-ionizing radiation requires a certain threshold level to produce an effect. Below the threshold, there is no cumulative damage. Damage occurs because water molecules oscillate at the frequency of the beam. When the threshold is reached, heat is produced through friction. It is the heat, rather than the radiation itself, which causes damage from microwave radiation. In determining the threshold level for a potential damaging effect of RF radiation, two factors must be considered: the frequency of the beam determines its depth of penetration; the size of the organism determines the absorption rate of the radiation. The distance from a source also affects exposure levels because energy levels decrease with the square of the distance from the source.

The human body is able to effectively dissipate heat with no adverse biological effects at a specific absorption rate (SAR) of 4 watts per kilogram or less as averaged over any six minute period. The permissible exposure levels (PEL) under Air Force standards are based on an exposure to RF radiation of one-tenth this value, i.e., .04 W/kg. PELs are expressed as the maximum average plane wave power density, in milliwatts per centimeter squared, that individuals may be continuously exposed to with no adverse effect.

The search radar housed in Building 1281 is located on a tower about 20 feet above ground level. The radar's reflecting surface, or antenna, is contained in the Radome on top of the tower. The exterior catwalk is approximately 9 feet below the lower edge of the reflector. The search radar antenna makes one revolution every 12 seconds, or five revolutions per minute. The rotation of the antenna never ceases, even if the radar is not transmitting. The search radar has two channels operating at an average of 1265 and 1310 megaherz (MHz). Its average power in these channels is 4320 watts. The beam pattern of the search radar is approximately 15 feet above the second floor of the Radome. The angle of the beam is fan-shaped about two-and-one-half degrees above the horizontal.

The beacon transponder operates at an average of 1020 MHz producing about 350 watts. It is run on the same antenna as the search radar.

The height finder scans a vertical plane at a rate of 20 scans per minute. It has the ability to operate 345 degrees in azimuth; a 15–degree sector is always blocked out in the direction centered on the Radome. It operates at a frequency of 2813 MHz, producing an average power of 2160 watts.

The Air Force PELs for a beam frequency of more than 1000 MHz is 10 milliwatts per square centimeter. An Air Force investigation into the alleged overexposure was concluded in January 1988. During this investigation a formal measurement of the RF radiation on the catwalk was conducted. Calibrations were made in two phases: (1) beacon transponder transmitting and search radar transmitting in its most powerful mode, with the height finder

radar directed away from the Radome; and (2) same as the prior measurement with the height finder radar operating so that it swept at its closest possible scan toward the Radome.

Calibrations were made at various locations on the catwalk and at various heights. Measurements below 10 feet above the catwalk ranged from 0.19 to 0.47 mW/cm2 in both phases. Measurements of 0.61 and 0.65 mW/cm2 were made at heights of 10 feet and 14 feet above the catwalk in two separate locations. The operation of the height finder radar produced no significant or measurable increase in the power density levels on the catwalk.

According to Dr. Adair, exposure to RF radiation at the level of 10 mW/cm2 would be safe for all persons under all conditions. She said that, based on the Air Force measurements, no injury to the plaintiffs could possibly have occurred. She testified that nothing in the medical records supported the allegation that plaintiffs had been exposed to harmful RF radiation while working on the catwalk.

Also testifying for the defendant was Dr. Jerome H. Krupp, Chief of Radiation Physics at the School of Aerospace Medicine in Texas. Dr. Krupp explained that ionizing radiation causes cell death due to the intensity of frequency. Non-ionizing radiation only creates heat. Ionizing radiation is known to cause leukemia and other forms of cancer, but microwave (or non-ionizing) radiation does not. Microwave radiation only causes damage above specific absorption rates, through the heating of the body. He said that with regard to the figures here, 5 mW/cm2 would be a permissible exposure level. He also found that the medical evidence in this case did not support a finding of harmful exposure to microwave radiation for many reasons, including the fact that microwave exposure would result in a feeling of being very overheated, while the plaintiffs all reported being cold.

## II. *Conclusions of Law*

This case was filed under the Federal Tort Claims Act [28 U.S.C. §§ 1346(b), 2671–2680]. The parties stipulated that the plaintiffs have complied with the administrative provisions of the Act. 28 U.S.C. § 2675. Under the Act, the government is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Thus, liability is determined under the law of the forum state. *See Standefer v. United States*, 511 F.2d 101, 104 (5th Cir.1975); *Williams v. United States*, 352 F.2d 477, 479 (5th Cir.1965).

In their complaint, the plaintiffs allege that the radar equipment in the Radome emits lethal RF microwaves, and thereby constitutes an ultrahazardous activity for which the United States is strictly liable. They also allege that the search radar was left operational while they worked, through the negligence of a governmental agent. At trial, the plaintiffs tried to prove injury as a result of the operation of the beacon transponder and the height finder radar.

First, it is true that under Florida law, a property owner can be held strictly liable for injuries resulting from the operation of ultrahazardous activities. *See Cities Service Co. v. State*, 312 So.2d 799 (Fla. 2d DCA 1975) (adopting doctrine of *Rylands v. Fletcher*). However, under the Federal Tort Claims Act, the United States cannot be held strictly liable in tort under state ultrahazardous activities law. *See Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). Thus, one of the plaintiffs' theories of liability cannot be sustained.

The government also maintains that it cannot be held liable for injuries which may have resulted from its decisions to leave the beacon transponder and height finder radar operational while the plaintiffs worked. The Federal Tort Claims Act does not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). While the execution of government policy which causes injury to private persons may form the basis of a federal tort claim, courts

generally will not second-guess the actual policy decisions of government officials. *See United States Fire Ins. Co. v. United States*, 806 F.2d 1529, 1535–36 (11th Cir. 1986).

The Supreme Court has established principles to analyze whether conduct alleged to have caused injury falls within the discretionary function exception. *See Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies. *See Varig Airlines, supra*, 467 U.S. at 813, 104 S.Ct. at 2764. The court must determine whether the action is a matter of choice for the employee or whether a federal statute, regulation, or policy dictated the specific action. Conduct cannot be discretionary unless it involves judgment or choice. *See Dalehite v. United States, supra*, 346 U.S. at 34, 73 S.Ct. at 967.

If the conduct involves choice, and therefore, discretion, the court must determine whether the action is the type which the discretionary function exception was designed to shield. *See Varig Airlines, supra*, 467 U.S. at 814, 104 S.Ct. at 2764. The basis of the exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through an action in tort. Thus, the exception applies only if the decision allegedly causing injury was based on considerations of public policy. *See Dalehite v. United States, supra*, 346 U.S. at 36, 73 S.Ct. at 968. "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz v. United States, supra*, 486 U.S. at ——, 108 S.Ct. at 1959, 100 L.Ed.2d at 541.

In this case, the Air Force continued to operate the beacon transponder in the Radome and the height finder radar without warning while the plaintiffs were working on the catwalk. The decisions to leave these sources of RF radiation operational were based on Air Force standards for the safety of persons working in and around sources of radiation. These regulations, in turn, were adopted pursuant to Air Force safety policies. The decisions to leave these sources transmitting involved various policy factors including: the danger to the plaintiffs; the benefits of aerial surveillance equipment; the difficulty of making arrangements for substitute surveillance if these were turned off; and the effectiveness of Air Force warning systems when there is in fact a danger of exposure.

■ I find that the decisions to allow the beacon transponder and the height finder radar to continue transmitting are protected by the discretionary function exception. In any event, the evidence does not support a finding that either of these sources of RF radiation could have caused an overexposure to RF radiation while the plaintiffs were working on the Radome catwalk.

The remainder of the plaintiffs' case falls within two possible theories. First, the plaintiffs allege injury because of negligence in the operation of the search radar while they worked on the catwalk. The Air Force decided to turn off the search radar while the plaintiffs worked, but the plaintiffs claim that the radar was left on and exposed them to harmful RF radiation.

The second theory of liability found in the pleadings is a breach of the defendant's duty to warn the plaintiffs of the dangers presented by the radar. This theory appears to arise from the status of the plaintiffs as business invitees at Tyndall. In Florida, the owner of premises owes two duties to a business invitee: (1) the duty to use reasonable care in maintaining the premises in a reasonably safe condition; and (2) the duty to warn of concealed perils which are or should be known to the landowner, and which are unknown to the invitee and cannot be discovered by him through the exercise of reasonable care. *See Emmons v. Baptist Hospital*, 478 So.2d 440 (1st DCA 1985), *rev. denied* 488 So.2d 67 (Fla.1986); *City of Milton v. Broxson*, 514 So.2d 1116 (Fla. 1st DCA 1987). The United States has been found

liable in tort on such failure to warn theories. *See Mandel v. United States*, 793 F.2d 964 (8th Cir.1986).

■ Liability, however, cannot be sustained on this theory. The evidence in the record demonstrates that none of the three radar sources, individually or in combination, endangered the personal safety of the plaintiffs if they were transmitting while the plaintiffs worked on the catwalk. Thus, there was no concealed danger of which to warn the plaintiffs. It appears that the Air Force was overly cautious in shutting down the search radar.

Turning to the plaintiffs' theory that the United States was negligent in that the search radar remained operational while they worked, I must find in favor of the defendants. This theory is very similar to the case of *Hix v. Billen*, 284 So.2d 209 (Fla.1973). In that case, the defendant invited the plaintiff onto his land to help the defendant repair his car; there was an accident involving gasoline, and the plaintiff was injured. The court pointed out that the case did not involve premises liability, dependent upon the status of the plaintiff, because the injury allegedly occurred through the negligence of the defendant rather than the condition of the premises. *See also Maldonado v. Jack M. Berry Grove Corp.*, 351 So.2d 967 (Fla.1977). In such cases, ordinary negligence standards apply.

In order to succeed on this claim, the plaintiffs must demonstrate: (1) the search radar was transmitting while they worked; (2) the search radar was powerful enough to emit harmful RF radiation; (3) the plaintiffs suffered injury as a result of exposure to RF radiation from the search radar; and (4) the operation of the search radar while the plaintiffs worked was due to the negligence of a United States agent.

■ The evidence presented at trial conclusively demonstrates that the search radar was not transmitting while the plaintiffs worked on the catwalk. The log and all personnel involved presented convincing evidence that the search radar was turned off from 11:55 a.m. to 3:40 p.m.

Even if the search radar was transmitting, the evidence shows that the plaintiffs could not have been exposed to a harmful level of RF radiation from the search radar, individually, or in combination with the beacon transponder and height finder radar. The Air Force measurements of radiation proved that no harmful levels of radiation can be detected on the catwalk during the operation of the various RF radiation sources.

Furthermore, the plaintiffs have presented no convincing evidence of injuries caused by exposure to RF radiation. Dr. Merrill has clearly confused radiofrequency radiation with electromagnetic radiation. His medical testimony is simply unbelievable. I find that Drs. Adair and Krupp are credible and that their opinions are accurate.

Finally, as the evidence demonstrates the search radar was turned off, there was no negligence committed by an agent of the United States in leaving it turned on while the plaintiffs worked. The plaintiffs have failed to show that any agent of the government performed negligently in any way.

Therefore, final judgment shall be entered in favor of the defendant and against the plaintiffs, with taxable court costs.

DONE AND ORDERED.